Mary E. MYERS et al., Appellants,

v.

YOUNGER BROTHERS, Inc., et al.,
Appellees.

No. 6175.

Court of Civil Appeals of Texas.
Beaumont.
Sept. 18, 1958.
Rehearing Denied Oct. 29, 1958

**930**

Baker & Vaughan, Port Arthur (Marcus, Weller & Evans, Beaumont, on appeal only), for appellants.

Keith, Mehaffy, McNicholas & Weber, King, Sharfstein & Rienstra, Beaumont, for appellees.

R. L. MURRAY, Chief Justice.

This is an appeal from a judgment in the district court of Jefferson County in favor of the defendants and against the plaintiffs. Judgment was based upon a jury's verdict, findings in which absolved such defendants of any acts of negligence and condemned as contributory negligence certain acts of the deceased husband and father of the plaintiffs.

On August 16, 1956 at about 7:15 or 7:20 p. m., the appellants, Mary E. Myers and her minor children, all plaintiffs in the court below, were riding in an automobile driven by the husband and father, H. J. Myers, on Highway 87 between Orange and Port Arthur in a westerly direction toward Port Arthur. At a point near the Atlantic Refinery about six miles east of Port Arthur the Pure-Atlantic road intersects Highway 87 and at that point a tank truck of the appellee Younger Brothers, Inc., operated by the appellee Mullis, stopped while making a left turn from the Pure-Atlantic road into Highway 87, blocking the entire pavement of that highway. A North American Van Lines truck pulled along the right side of the tank truck of Younger Brothers and stopped parallel to the paved Highway 87 a short distance east of the cab of the Younger Brothers truck. Mullis, the driver of the Younger Brothers truck, did not put out any flares and reflectors or lights. The Myers car, traveling at approximately 40 miles per hour, was driven into the side of the stalled Younger Brothers tank truck. In the collision Myers was killed and Mrs. Myers and the children suffered very serious bodily injuries.

Mrs. Myers filed suit for herself and in behalf of her minor children against Younger Brothers, Inc., and Mullis, the driver of the Younger Brothers truck and against North American Van Lines, Inc., and one Proctor, driver of the van truck.

Other parties originally joined as plaintiffs but the trial court rendered judgment on an instructed verdict against them as to all parties defendant. The trial court also rendered judgment on an instructed verdict in favor of North American Van Lines and Proctor, its driver. No complaint on this appeal is made of any of such actions on the part of the trial court. The issues of fact were thus joined between the appellants, plaintiffs in the trial court, and appellees, defendants in the trial court.

The trial court submitted the case to the jury on special issues and the jury, in answer to such special issues, made the following findings in their verdict:

(1) Mullis failed to put out warning signals to warn approaching traffic of the presence of the Younger Brothers' truck at the time and place of the collision; (2) such failure was not negligence; (4) Mullis deviated from the paved portion of Highway 366 (this was also known as the Pure-Atlantic road) so as to enter upon Highway 87; (5) such act was not negligence; (7) the collision was not the result of an unavoidable accident; (8) H. J. Myers saw the flashing lights on the North American Van Lines truck immediately prior to the collision; (9) after he saw such flashing lights he failed to slacken the speed of his vehicle; (10) such failure was negligence and (11) such failure was a proximate cause of the collision; (12) after Myers saw the flashing lights he failed to stop his vehicle before colliding with the Younger Brothers truck; (13) such failure was negligence and (14) was a proximate cause of the collision; (14-A) after Myers saw the flashing lights he failed to turn his vehicle to the right, or the north side of the Younger Brothers truck; (14-B) such failure was negligence; (14-C) and such negligence was a proximate cause of the collision. (15) The jury did not find that Myers did not see the flashing lights on the North American Van Lines truck immediately prior to the collision; (18) immediately prior to the collision Myers failed to keep a proper lookout for vehicles and obstructions upon the highway in front of him which a person of ordinary prudence would have kept in the exercise of ordinary care in the same or similar circumstances; (19) such failure was a proximate cause of the collision; (20) when the Younger Brothers truck stopped on the highway the driver thereof was faced with an emergency; (21) after such emergency arose the driver Mullis was not negligent, taking into consideration the emergency with which he was confronted. To Special Issues Nos. 22, 23, 24, 25, and 26, which inquired of the jury what sum of money in cash would reasonably compensate the appellants for the pecuniary damages, if any, sustained by them or which will probably be sustained by them in the future, as a direct proximate result of the negligent act or acts, if any, of the defendants, appellants, the jury answered "none".

The appellants filed their amended motion for new trial, which alleged, among other things, misconduct on the part of the jury during its deliberations. The court heard evidence concerning such matters. The trial court overruled the amended motion for new trial of the appellants and entered judgment against the appellants in favor of the appellees on the jury's verdict. The trial court thereafter filed findings of fact and conclusions of law on the question of jury misconduct and therein found as facts that the jury did not enter into any agreement to bind themselves to a majority rule in deciding the special issues, that the jury did not enter into any agreement to answer the issues so as to favor one party or the other, and that before any special issues had been answered in writing, the jury read and considered each and all issues submitted, took several preliminary polls while discussing the evidence, and finally arrived at an unanimous view generally favoring the defendants on the issues before the jury, that thereafter the jury proceeded to re-read, reconsider, and answer in writing each issue, with considerable debate and several polls or votes on some of the issues, and ultimately agreed

unanimously on the answers to each issue submitted separately. The trial court thereupon filed as his conclusion of law that the jury was not guilty of misconduct such as to warrant a new trial.

Thereafter the appellants duly perfected their appeal to this court for review of the judgment. They present their appeal under 26 points of error. By their first 13 points they complain of the trial court's findings of fact and conclusions of law in regard to their complaint of misconduct on the part of the jury.

By points Nos. 14 and 15 they complain of portions of the argument to the jury made by counsel for the appellees in which he argued that Mullis, the driver of the Younger Brothers truck, was not guilty of any fault because sworn statements showed that Texas Highway Department, Highway Patrol, Jefferson County Sheriff's Department and the District Attorney's office made a thorough investigation of the collision and that the investigating bodies were concerned with the same thing that the parties were concerned with before the court and that they completely exonerated Mullis and turned him loose.

By their points Nos. 16 and 17 they complain of a portion of the argument to the jury by counsel for the appellees that Mrs. Myers, after the death of her husband, would receive a larger pension from the Government than the pension which he had received during his lifetime and that she would also receive Social Security payments.

By their 18th point they argue that the combination of all said improper arguments was prejudicial and inflammatory.

By their points Nos. 19, 20, 21, 22 and 23 they complain of the wording of certain special issues contained in the court's charge and the lack of evidence to warrant the submission of such issues.

By their 24th point they complain of Special Issue No. 18 in the court's charge in regard to "proper lookout" on the part of the

deceased. By their 25th point they complain of the special issue in the court's charge inquiring whether the driver of Younger Brothers' truck was faced with an emergency. By their 26th point they complain of the findings of the jury in answer to Special Issue No. 2 of the court's charge, which answer was that failure of the appellee Mullis, the driver of Younger Brothers' truck, to put out warning signals was not negligence. They say there is no evidence to support such finding of the jury.

We first discuss the appellants' first 13 points, which relate to the question of misconduct of the jury. Upon the hearing conducted by the trial court upon the allegations of jury misconduct, four members of the jury, including the foreman, testified. The evidence of these four witnesses was in conflict in various details, and in some instances the witnesses gave testimony on cross examination in such manner that it was in conflict to some extent with their own testimony given on direct examination.

M. L. Deckard, foreman of the jury, testified on direct examination that after the court had charged the jury, the jury retired to the jury room and the first order of business was to select the foreman. Deckard then testified:

"Q. After the foreman was selected, just tell me what was the first thing that the jury considered and studied? A. I don't know if I could tell you exactly the first thing we did. One of the important things that happened right along there was one member of the panel suggested that we decide there and then whether or not we would—the majority would rule in the question when the question came up, and we had to vote on it, if a majority was in favor of this or that, whether or not the majority would rule, that was then discussed.

"Q. All right. Was there any decision reached on that? A. Yes, but it was later, to a degree, rescinded.

"Q. What decision was first reached on this question of the majority? A. That we would abide by that.

"Q. Was there a vote taken on the issue of whether the jury would be bound by a majority vote? A. Well, I don't recall necessarily if there was a vote taken on it. I do know that we agreed upon it, but immediately when we started reading the charge and considering the issues, I took issue with that question, with that point of it, myself, and saw that that would not necessarily work."

Deckard further related that after the jury panel had read the charge through, the jury then voted seven to five that they favored the defendants. A second vote was taken, and it came out ten to two. Then, after a lengthy discussion, the two minority jurors, one of whom was Deckard, eventually agreed to go along with the others. He stated that at the time these votes were taken the jury had not answered the special issues but had read them through and discussed them. He testified that after they had reached a unanimous decision that they all favored the defendants on the issues submitted, they proceeded to discuss, consider, and answer the special issues.

"Q. * * * Did you take any votes on these special issues? A. Oh, yeah. Oh, yeah, we took a vote on each one of them.

"Q. You took a vote on each one of them? A. Yeah.

"Q. Well, Mr. Deckard, after this vote to decide the case for the defendant, how did you all proceed to answer the special issues? A. Well, we read them through. Some of them we read through many times because we could not quite understand them. We had to go back and refer to our definitions—I mean an issue, and we each one, we went through them very carefully."

He later repeated his testimony that the jury found that they favored the defendants before they answered any of the special issues, but stated that prior to the time that they took the poll they had discussed the whole thing and gone through it very carefully. In reply to further questioning by appellants' counsel, the following testimony was brought out:

"Q. Mr. Deckard, if you had not had this agreement or voted to decide this case for the defendant, would these answers—would the answers to the special issues have constituted your verdict? A. In the form that the charge was presented to the jury, yes."

In explanation of this statement, Deckard testified that he thought there was certain testimony and evidence in the case raising issues which were not submitted, and that there were some factual issues the jury was not given an opportunity to answer. Later, Deckard testified:

"Q. Mr. Deckard, was the decision which you all made as to who you favored, was that based on the evidence or—or was it based on something else? A. It was based on the evidence.

"Q. All right, sir. A. We had there in front of us.

"Q. * * * Was your decision based on the evidence in the light of the charge as you had it? A. Yes.

"Q. Was there ever any kind of agreement made that the jury would disregard the evidence? A. No.

"Q. * * * But I am talking about in the light of the charge as it was given to you, did you decide to favor Mullis on the basis of the evidence, or did you decide to favor him on the basis of something else? A. Well, we tried to—this is what we did— if you will permit me to give you a little resumé of how we did it, how we went about it?

"Q. All right, sir. A. We discussed who was negligent and who was not negligent in the case, quite at length.

"Q. This was before you took this vote? A. Well, no, that was after this vote was taken to have majority rule.

"Q. All right. A. And in the light of the special issues we then presented the case —we couldn't see where we could render any other verdict then the one we rendered.

"Q. Other than to find Mullis was guilty of no acts of negligence asked about in the charge? A. Right." Again:

"Q. And you all never at any time entered into any agreement to hold in favor of Mullis regardless of what the evidence showed, did you? You never agreed to disregard the evidence, did you? A. No. I don't think so. There was just evidence which should have been added in there we could have worked on.

"Q. In connection with other issues which weren't there? A. Yes, sir.

"Q. All of my questions, Mr. Deckard, have to do with just the charge you worked on? A. Yes.

"Q. Now, on the basis, when you reached this agreement, what you were all agreeing upon, asked about whether or not Mullis did anything wrong, the evidence would compel you to answer those no, is that right? A. That is right.

"Q. And that decision was based on a full and complete discussion of the evidence in the lawsuit, was it not? A. Yes, with what we had before us.

"Q. That is what I mean, with what you had before you? All right. And various people took various positions, did they not, as you went through discussing the various acts of negligence? A. Yes. This was before we started writing down our answers to the issues, yes, sir.

"Q. In connection—as you went through, as you said, everybody had agreed Mullis was guilty of none of the acts of negligence charged here? After that agreement was reached, that was the poll where everybody was finally twelve to nothing, is that right? A. Yes, sir.

"Q. After that, when you went through you answered each issue, each issue—was each issue answered in your judgment, each question according to the evidence? A. I have already testified that we—answered the issues to fit our verdict.

"Q. Sir? A. I have already testified we answered the issues to fit the verdict we had already reached.

"Q. But the decision you had reached was based on the evidence, was it not? A. Well, we thought so."

O. B. Tamplin, the next juror to testify, stated that when the jury first retired to the jury room, they started discussing for or against the defendants and then took a poll. He believed that the first poll, taken before any special issues had been answered, was five to seven for the defendants. A second poll was taken and the result was a vote of ten to two for the defendant, with Tamplin being one of two minority jurors. After more discussion of the evidence, Tamplin testified that he decided that he might possibly be wrong and a third poll resulted in a unanimous vote favoring the defendants. Tamplin testified that the jury then started on the issues. Insofar as this procedure was concerned, he testified:

"Q. All right, was there any disagreement among you in answering the special issues as you went along? A. Well, there was one on the truck being in the highway and I believe that was one of the charges about the way it went off the highway, crossed, going into the highway.

"Q. Was there any agreement among the jury prior to answering this special issue that you would be bound by a majority vote on the issues? A. No, sir, we discussed it, but we never did decide on it.

"Q. Did you vote on each issue separately after— A. Yes, sir.

"Q. After you made this agreement you would decide for the defendant? A. Yes, sir, that is right."

On cross-examination, Tamplin testified that before they took the poll, everyone discussed the things that they had heard from the witness stand, that he had heard the judge read the charge and heard the arguments and knew what negligence was charged against Mullis, and that when he

was voting, he knew he was voting as to whether or not Mullis was guilty of any negligence. That the jury took three polls and then afterwards they went ahead and discussed each issue separately and voted on each issue separately. He elaborated on this by testifying:

"Q. What was discussed before you voted on each issue, what was talked about? A. After that first poll was taken, we decided for or against, we went into the issues, we would read them off.

"Q. What was discussed? A. The issues.

"Q. Was that all, just discussed the issues? A. Yes, sir.

"Q. What do you mean discussed the issues? A. Well, what caused it, who done what.

"Q. You mean you discussed the evidence? A. Yes, sir.

"Q. All right. And your discussion on each issue was just reference, was to—with reference to the evidence on that particular issue, is that right? A. Yes, sir.

"Q. And after the discussion was complete, I suppose there was somebody—somebody would express one view and somebody else would express another one, is that right? A. That is right.

"Q. And there would be a discussion on each separate issue and the evidence bearing on that particular issue? A. That is right.

"Q. And after the discussion was terminated, you all would take a vote, is that correct? A. Yes, sir, that is correct.

"Q. That vote would be unanimous in each instance? A. That is right.

"Q. And you would answer that issue and go on to the next one, is that right? A. That's right, yes, sir.

"Q. Was there a pretty full discussion of the evidence? A. There was a good bit.

"Q. How long did it take you all to decide these issues? A. About two or three hours—three.

"Q. But you all did not go in there and reach any agreement that you were going to hold against this woman and her children on any issue other than the evidence, did you? A. No, sir, that is right.

"Q. Your decision was on the basis of the evidence you heard in the case, was it not? A. Yes, sir."

In explaining how he and Deckard, after the ten to two poll in favor of the defendants was taken, changed their mind and sided in the majority, Tamplin testified:

"Q. Do you say that you and the foreman of the jury were the last to change over? A. Yes, sir.

"Q. And what you were doing, you were changing over to where you went along with the majority in believing that Mullis was not guilty of any of the negligence that the plaintiff has charged him with? A. I thought possibly I might be wrong. I think he (Deckard) said the same thing, he might be.

"Q. In connection with the acts of negligence that the court inquired about? A. Yes, sir."

On redirect examination he testified:

"Q. After they voted, did the jury then proceed to answer the questions? A. Yes, sir.

"Q. Did they then proceed to answer those issues so as to carry out that agreement to decide that case for the defendant in this case? A. It turned out that way, yes, sir."

M. J. Thompson, the next juror called by the plaintiff, testified that after the argument of counsel and after the court had delivered the charge to the jury, the jury retired and the first thing that was done was to take a poll to see whether all the jurors voted the same way or whether the truck driver was guilty or not. This poll

was taken prior to answering all of the special issues and the vote was seven to five in favor of the defendants. Several more polls were taken and finally the jury voted to vote one way before they answered any of the special issues, at least Thompson did not think they had taken a vote on any special issue.

With regard to whether or not the jury agreed to be bound beforehand by a majority vote, Thompson testified on direct examination that they tried to make an agreement to be bound by a majority vote on the special issues and that they finally did, but that they then voted on each issue separately and if there was a difference of opinion, it was discussed, that maybe two or three would be still against it, and one side would argue their point and the other side would argue theirs, but that they would finally decide to go that way because the majority was that way; however, he admitted that the agreement was not his understanding and that he never did go along with the other jurors on that. And on cross-examination, Thompson testified that each issue was discussed and voted on, that sometimes there was disagreement and further discussion and argument about it. That in the end everyone finally came to an agreement on the basis of the discussion of the evidence. With regard to the majority poll, his testimony was:

"Q. Now, insofar as this majority thing is concerned, Mr. Deckard, the foreman, testified that he told them that wasn't the way to do it, do you recall him saying that? A. That is right.

"Q. And after he said that and everybody felt free to express their own views, did they not? Answer out. A. Yes, sir.

"Q. And they did express their own views? A. Yes, sir. That is right.

"Q. Even the minority did? A. Yes, sir.

"Q. And finally though in each instance on each issue there was a unanimous decision, was there not? A. Yes."

He further testified that there was a lot of disagreement on whether or not Mullis was negligent in failing to put out warning signs and that this was after the first preliminary poll had been taken; that a number of people expressed disagreement on that issue, including himself.

"Q. And what happened then, did you discuss the evidence about whether he was or was not negligent? A. That is right.

"Q. And you were finally persuaded that he was not negligent? A. I was persuaded but not convinced.

"Q. That is a good way to put it. And did you have any discussion on the other issues along the same line? A. That is right.

"Q. Did you feel free in spite of this earlier vote to express your opinion? A. Well, I did, I guess I felt free.

"Q. And you felt free to vote against the majority when you felt like it, did you not? A. That is right.

"Q. And you did vote against it the majority vote— A. That is right.

"Q. —up until the time when you were persuaded but not convinced? A. That is correct.

"Q. And you were persuaded by the arguments of the other men on the evidence, were you not? A. I don't know whether you can say it was on the evidence or not, because I believe if the evidence had been sufficient I would have been convinced.

"Q. What I am getting at is that you weren't persuaded by something—what persuaded you was what the other men said about the testimony that you heard? A. That is right."

He also indicated that if the jury had made any agreement to be bound by a majority vote, they ignored the agreement later on, for he testified that the jury took several votes on the various special issues as they went along discussing them, and that he believed the first one required more

votes than any of the rest, but a number of them required more than one vote. After each vote on each issue, there would be further discussion and then another vote would be taken until finally they arrived at an unanimous vote on the issue. They would then go on to the next issue and discuss the evidence on that and then take a vote. If that vote was not unanimous, there would be further discussion on the evidence and then another vote would be taken, and this procedure was followed until the jury finally arrived at the end of the verdict. However, he stated that he wished he had answered some of the issues the other way when they got to the last issue and when he saw that it worked out where the plaintiff did not get any money.

C. G. Glanville, called as witness by the defendants, testified that he was one of the jurors in the case, and that when the jurors retired to the jury room, they took a poll and the verdict was seven to five in favor of the defendants. Then, discussion went on as to proceedings there and investigation during the trial and another poll was taken just to see, according to Glanville, what the thing was worth, and he stated that the poll had no bearing on the case. The jurors then went on to discuss and consider the issues and different people expressed their own ideas about what the answers to the issues should be. Whenever there was any doubt as to what the issues meant, they asked for re-readings sometimes two or three times or more. He believed that they voted on each issue just once, but he stated he might have been mistaken. He confirmed the testimony of the other jurors that they discussed each issue pretty thoroughly in light of the facts. In regard to the effect of the various polls taken on the verdict and whether the jurors agreed to be bound by a majority vote, Glanville's testimony was:

"Q. What was said in the jury room with reference to whether the polls were or were not binding? A. Two or three of us mentioned the fact that the polls should not stand; it was just a matter there

of seeing how we felt about it, but it was brought up several times that this poll was not a binding issue at all.

"Q. Mr. Glanville, state whether or not there was any agreement entered into by the jury with reference to whether or not a majority rule would prevail? A. No, sir. I think something was brought up about that, but we all said that could not be, it had to be a case there where we decide on our own decisions."

On cross-examination, Glanville testified that one of the first things the jury did after electing a foreman was to take a poll to see how the jury felt, for or against the defendant. He also testified that a second poll resulted in a ten to two vote in favor of the defendant and that after a third poll was taken, it turned out that everyone had agreed to go along for the defendants. Glanville could not recall whether they had started on the issues yet or not, nor could he remember whether they answered any of the issues. Again, he stated that a poll was taken in favor of the defendant generally but he did not think it was understood that was to be the result, that he did not think that was the strict purpose of it, but rather the vote was taken to hasten things along. He reaffirmed that there was lots of discussion before they voted one way or the other since they wanted to be sure, and further:

"Q. Now, on these votes on these issues did you all agree to be bound by the majority? I believe you said there was some discussion there about it? A. That came into it. Several of us brought out the fact no, that should not be, we could not use that at all.

"Q. Was that discussion had after you took this poll and agreed to decide this case for the defendants? A. No. I believe that was the occasion of the procedure of taking the poll.

"Q. That was in the procedure of taking the poll? A. I am not sure when it

was brought out, it was brought out, earlier. What the poll was that was not the answer, we still had the issues to go on."

The appellants contend that the undisputed evidence shows that the jury was guilty of misconduct, prejudicial to them, in voting and agreeing that a verdict would be rendered for the appellees before answering and considering the special issues, and then proceeding to answer special issues so as to carry out their agreement; they contend that the undisputed evidence also shows that the jury was guilty of misconduct prejudicial to their rights in voting and agreeing upon retiring that the majority vote of the jurors would rule on all decisions and answers of the jury; they further contend that the evidence is undisputed that the jury after agreeing that their verdict would be rendered for the appellees and agreeing that they would be bound by a majority vote they then proceeded to answer the special issues so as to carry out their decisions. They contend further that there is no evidence to support the trial court's finding that the jury did not enter into such an agreement to answer the issues so as to clear one party or the other, and in the alternative they say that if there was any evidence in support of such fact finding, then the evidence is insufficient to support the finding and is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong. Appellants make the same contention in regard to the trial court's fact finding that the jury did not enter into any agreement to bind themselves to a majority rule in deciding the special issues. They make the same contentions in regard to the trial court's fact finding No. 3, which finding is set out in full above in Paragraph 5.

The parties in their briefs are not in serious disagreement as to the rules of law applicable to this portion of the controversy. The appellants in their brief rely to some extent on a number of decisions made prior to the adoption of Texas Rules of Civil Procedure. Rule 327, T.R.

C.P., now makes it incumbent upon the litigant claiming jury misconduct to prove that such misconduct occurred and that such misconduct probably resulted in injury to him. Whether or not misconduct actually occurred usually is a question of fact for the trial court, and the trial court's finding upon disputed or conflicting evidence is binding upon an appellate court. See: Texas Employers' Ins. Ass'n v. Layton, Tex.Civ.App., 278 S.W.2d 453 and cases cited; Thompson v. Goode, Tex.Civ. App., 221 S.W.2d 569. It seems to be well settled now that if a jury votes and agrees to return a verdict in favor of one of the parties and thereafter attempts to answer all the questions submitted with a view of bringing about that result, it is misconduct requiring a reversal, if the jury agreed to be bound by the results of such proceeding. But if the result was reached and no agreement had beforehand to abide by, and it was afterwards agreed upon as their verdict, it would be sustained. See Trousdale v. Texas & N. O. Ry. Co., 154 Tex. 231, 276 S.W.2d 242. The testimony of a juror that he felt bound by an agreement, if there was no agreement to be bound, was merely testimony as to the mental process by which he arrived at his verdict. We do not agree with the contentions of the appellants that the evidence heard on the motion for new trial was conclusive in their favor on the issue of jury misconduct. We have set out above in some detail not all but a substantial portion of such evidence. We have concluded that the findings of fact made by the trial court are not subject to the attacks made upon them by the appellants in their brief, but such fact findings are based on conflicting testimony and that such findings find sufficient support in the evidence set out above. It seems clear that shortly after retiring to consider their verdict in this case, the jurors took a vote to determine how the jurors reacted to the testimony as to whether appellee Mullis was guilty of negligence in failing to put out warning lights or signals, and that thereafter there was considerable discus-

sion of that issue and all the other issues. We think it is equally clear that from their discussion in regard to that important issue the jurors decided in their own minds all the issues in the lawsuit. It is clear also that there was a discussion and vote on all the issues submitted in the court's charge, and a final unanimous agreement on all such issues. The evidence is not at all conclusive that the jurors voted to be bound by a majority vote in answer to the issues. We believe that no error is presented by appellants' points Nos. 1 to 13, inclusive, and they are overruled.

■ The most serious question presented on this appeal is that contained in appellants' point No. 14. This point complains of a portion of the argument by counsel for the appellees when he made the following argument to the jury:

"I think there is a piece of evidence which came out at the very beginning of this lawsuit in connection with whether or not Bill Mullis was guilty of any fault. A person is not bound by that bit of evidence or any bit of evidence. You all saw Bill Mullis testify in this lawsuit. You see him sitting over there right now. You can look at him, and you know what kind of a person he is. You can make up your minds on whether you think that this bit of evidence I think is pretty important is that after this accident happened it wasn't just forgotten about, an investigation was made that very night, that was how these statements happened to be available. They were sworn statements. The evidence shows that the Texas Highway Department, State Highway Patrol participate in that investigation. It shows that the Jefferson County Sheriff's Dept. participated in the investigation and it shows that the District Attorney's office participated in that investigation, and what did they do when they got through checking, making a thorough investigation? They were concerned with essentially the same

thing that we are concerned with now, that is fault. What did they do? They completely and absolutely exonerated Bill Mullis, and turned him loose, filed no charges whatever, and what Carl Vaughn says will make him so happy is for these twelve men eight months later on the basis of testimony that is no stronger than was there, to say, 'No' that the Highway Department was wrong, the Sheriff's Department was wrong, the DA's office was wrong, we are going to impose and superimpose our judgment, we are going to say to those officers who were sworn to perform their duty that exonerated this man they were wrong, on the basis of that testimony."

Such matters as are stated in this argument have been condemned many times as improper and prejudicial. See Condra Funeral Home v. Rollin, Tex., 314 S.W. 2d 277 and cases cited. The remarkable thing about this argument is that it was made without objection by the opposing counsel. In the course of the trial, however, while Mullis was testifying as a witness he was asked by appellees' counsel whether the Highway Patrol or the District Attorney's office filed any charges against him after investigation of the collision and he answered "No". He was then asked "in other words they completely cleared you of all responsibility?" Counsel for appellants made objection to the testimony and asked that it be stricken and counsel for appellees thereupon withdrew the question and asked the following question: "State whether or not you were or not cleared of all responsibility, of all fault in connection with this accident by the authorities?" Objection was made and counsel for appellees asked another question, "State whether or not insofar as the State of Texas is concerned you were absolved and cleared of all responsibility in connection with this accident." Objection was made and after some discussion with the court, counsel for appellees stated, "I will withdraw that question." Counsel for

appellees then asked the witness if the District Attorney made a fair investigation, if the State Highway Patrol made an investigation, was the Sheriff's Department represented, to all of which questions the witness answered "Yes". Counsel for appellees then asked this question without objection, "Did any of these agencies, the District Attorney's office, the Sheriff's office or the State Highway Patrol, if any of them file any kind of charges whatever against you?" The answer was "No, sir". It is noted that the argument above, which is complained of under this point, even goes beyond the evidence that counsel for appellees succeeded in getting into the record without objection. The argument states that the officials and authorities, who in behalf of the State of Texas, conducted an investigation of the accident, were concerned with essentially the same thing that the court was then concerned with on the trial, and that was "fault". The argument goes further and contends to the jury, in effect, that not only had the authorities exonerated Mullis of any criminal responsibility, but had also settled the question of whether Mullis was negligent in failing to put out warning signals or reflectors to warn travelers on the highway of the presence of his stalled truck on the highway. Of course this was improper; it was an incorrect statement of what issues were before the court and it was an incorrect statement of the effect of the failure of the State authorities named to file any criminal charges against Mullis.

We have been greatly concerned in the course of a study of this record over the question whether failure of appellants' counsel to make objection to the above argument when the argument was made has waived the error. Appellees in their brief present an excellent discussion and analysis of the rule in this state regarding improper argument of counsel. They discuss the rule announced in Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054; Texas Employers' Ins. Ass'n v. Haywood, 153 Tex. 242, 266 S.W.2d 856; Price v.

Pelton, Tex.Civ.App., 199 S.W.2d 249; Rogers v. Broughton, Tex.Civ.App., 277 S.W.2d 121 and finally Wade v. Texas Employers' Ins. Ass'n, 150 Tex. 557, 244 S.W.2d 197, 201. In the Wade case the Supreme Court announced in considering the rule observed in the above cases that in considering whether argument is of the incurable type the true test is the degree of prejudice flowing from the argument, whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict; "we judge by the degree of vice, not merely the subject matter of the argument."

We are satisfied that the vice in this argument is of such magnitude and high degree, and was directed at such a vital element of fact in this lawsuit, that its harmful effects were not waived and could not be waived by the appellants' failure to object at the time the argument was made.

■ Under Rule 434, T.R.C.P., the judgment of the trial court in this case should not be reversed unless we shall be of the opinion that the argument complained of amounted to such a denial of the rights of the appellants as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in this case. In order to determine whether the argument amounted to such a denial of the rights of the appellants as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in this case, we are required to look to the entire record of the case. See: Aultman v. Dallas Railway & Terminal Co., 152 Tex. 509, 260 S.W.2d 596; Condra Funeral Home v. Rollin, Tex., 314 S.W.2d 277. To do this a review of the evidence is necessary.

The Younger Brothers truck, a tank truck loaded with gasoline, stalled at the intersection of Pure-Atlantic road and State Highway 87 and came to a halt

squarely across Highway 87. So far as the record shows, the motor stalled and the truck stopped through no fault of the driver. The allegation of negligence made against him by the appellants was that he failed to put out warning flares, lights or reflectors on the highway to warn travelers of the presence of the truck. Mullis, the driver, testified that the clock in his truck was stopped at 7:15 p. m., probably from the stopping of the motor. Myers' car was driven into the side of the truck about five minutes later. Mullis got out of his cab and halted cars coming from the west from Port Arthur. He apparently made no effort to stop traffic coming in the opposite direction from Orange, but busied himself in attempting to move the truck from the highway. He said that other cars coming from Orange had turned off to the right, going around his truck without any difficulty. When the North American Van Lines truck pulled up on the righthand side of the highway he made an effort to find a tow line by which the van could pull the truck off the highway. The driver of the van testified that he had pulled up to where the rear end of his van was slightly in front and on the east side of the Younger Brothers tank truck, preparing to back up in an effort to hook on to the tank truck. He then turned his headlights off and had his clearance lights on and both of his indicator lights flashing. While he was in this position in the act of preparing to hook on to the tank truck, Mullis walked east toward Orange and waved at the oncoming Myers car and threw his hat or cap in the air in an effort to warn him when he was about 45 feet away. From all the evidence the Myers car was traveling at about 40 miles per hour down the highway when it ran into the stalled truck.

It is evident from the testimony given by the four jurors on motion for new trial that the principal question of difference and debate was whether Mullis was negligent in failing to put out some sort of reflectors or warning lights on the high-way. It is also evident from the same testimony that the argument of counsel complained of had its effect on the jurors, because they first took a vote on whether or not the truck driver was guilty of negligence, and some of the witnesses used the word "guilty" in their testimony. The jury had before it testimony that a large dark colored truck without lights was across Highway 87, and that the driver had put out no reflectors or flares or warning lights on the Orange side of the truck. The testimony was that the directional blinking lights on the van truck were flashing and blinking. Mrs. Myers, one of the appellants, testified that as they were approaching the scene of the collision she saw headlights and blinking lights and that "they were to the left of our car as we were coming down the highway"; that she recalled telling her husband, the deceased, Mr. Myers, that it looked like a big truck and to slow down, which he did, and he replied one word "yes". She further testified that Mr. Myers knew there were blinking lights or something ahead of him on the highway. Such lights, of course, were not on the stalled tank truck but were off on the south side of the highway to the left of the Myers as they approached the stalled truck. This does not appear to be a warning to Myers as he approached the stalled truck, that there was something across the highway itself, but rather appears to have been a warning that something was stopped on his left side of the highway ahead.

We think the evidence as a whole points in the direction of negligence on the part of Mullis in failing to put out warning lights or reflectors before he attempted to get his tank truck off the highway. There is no question that the evidence would have supported a finding by the jury to that effect. We think it follows logically that but for the improper and prejudicial argument of counsel complained of the jury probably would have viewed this failure on the part of Mullis as negligence and a proximate cause of the col-

lision. They were undoubtedly swayed by the argument that the authorities whose duties were to investigate such occurrences had found Mullis blameless, and by the erroneous statement by counsel in his argument that these parties were concerned with the same thing as the court and jury were concerned with on the trial. From the testimony of the four jurors on motion for new trial, it is evident that once they decided that Mullis was free of any fault then their verdict should be for the defendants. This was decided first by a vote of seven to five and later by a vote of ten to two, and later by unanimous vote after considerable debate and discussion. It is easy to understand that the jury, after making this all important decision, in favor of the innocence of Mullis, found it easy to answer the other issues in the court's charge involving the contributory negligence of the deceased in favor of the defendants below, the appellees here. The fact that the deceased Myers told Mrs. Myers shortly before his death that he saw the lights to their left or answered her question to that effect is no evidence that he saw the dark colored truck across the road in front of him. We have concluded after a long and onerous reading of the statement of facts that the improper and prejudicial argument of counsel very probably caused an improper verdict to be reached by the jury, both on the question of negligence vel non of Mullis and the question of negligence and proximate cause found against the deceased Myers. We sustain the appellants' 14th point and hold that the argument complained of, in view of the entire record in the case, probably caused the rendition of an improper verdict and improper judgment in this case, and for this reason the judgment of the trial court is reversed and the case is remanded for a new trial.

Point No. 15 presents no error and it is overruled.

■ The argument complained of in appellants' points Nos. 16 and 17 was counsel's argument to the jury that Mrs. Myers, the appellant, will receive a pension from the Government as a result of her husband's death and Social Security. The argument was made under the following circumstances: Mrs. Myers testified on direct examination that her deceased husband was employed by the City of Port Arthur at the time of his death and that he was also drawing a pension of $57.75 per month from the Federal Government for disabilities received as a result of injuries during World War II. On cross-examination it was developed by counsel that after the death of her husband her payments from the Government as the widow of a veteran of World War II would be at least $96 per month and that she would draw $120 per month Social Security. In his argument counsel stated that, "The evidence in this case shows that fortunately we have a situation which makes me feel a little bit better about it. This was a tragic enough accident as it was, but at least we are not dealing with a situation where you all have to decide this case and it doesn't make Mr. Vaughn happy at least this woman is not turned out in the cold, because you heard the evidence that her husband was receiving a pension from the Government, and upon his death she receives a pension which fortunately is substantially more than the amount of money that he was receiving during his lifetime." We believe this point presents no error and it is overruled. It was a comment upon the evidence which had been originally developed by the appellants themselves and which was properly in evidence. No harm is shown to the appellants by this argument, since the principal question at issue is that of the negligence vel non of Mullis and the deceased, Mr. Myers. There is no question but what if the jury had found liability on the part of the appellees, the evidence would have supported and the jury would have found a substantial sum as damages in favor of the appellants. These points present no error and they are overruled.

Point No. 18 complains of the cumulative effect of both arguments discussed

above, in the event it should be held that neither one of itself constituted reversible error. It is unnecessary to pass on this point, since we have held the first argument presented such error.

By their points Nos. 19, 20, 22 and 23 appellants complain of the trial court's action in overruling their objections to Special Issues Nos. 8, 9 and (14-a) of the court's charge. Special Issue No. 8 inquired of the jury whether H. J. Myers saw "the flashing lights on the North American Van Lines truck immediately prior to the collision in question." Under these points they say that the issue as framed is a comment on the weight of the evidence, that there were flashing lights on the North American Van Lines truck, that there was no evidence of the existence of flashing lights on such truck, that the Special Issue as framed assumes the existence of flashing lights on the Van Lines truck and tells the jury that there were flashing lights on the Van Lines truck. If there had been a serious controversy in the evidence as to the existence of flashing lights on the Van Lines truck, the Special Issues complained of would have been subject to the complaints made by the appellants, but the existence of blinking or some sort of directional lights on the Van truck appears to have been established without controversy. From the testimony of Mullis, Proctor and Mrs. Myers there were blinking lights on the North American Van Lines truck. This being the case it was not error for the trial court to assume in the wording of the Special Issues complained of that there were lights flashing on the Van Lines truck. See Coca-Cola Bottling Company v. Krueger, Tex.Civ. App., 239 S.W.2d 669; DeKalb Hybrid Seed Company v. Agee, Tex.Civ.App., 293 S.W.2d 64, 65, and cases cited therein. These points present no error and they are overruled.

Appellants' Point No. 21 reads as follows:

"The trial court erred in overruling plaintiffs' objections to Special Issue No. 8 to the effect that such issue as submitted created a greater burden on plaintiffs than is required by law in that if there was any evidence of lights they were directional lights and not flashing lights and further, a finding that Myers, deceased, did see the flashing lights would not be a sufficient finding upon which to predicate any issue of negligence or proximate cause because there was no evidence to show that such directional lights on a truck off the highway would constitute any warning to a person using the traveled portion of the highway of the existence of any dangerous obstruction across the traveled portion of such highway."

An objection made by the appellants on the trial to the above Special Issue reads as follows:

"That there is no testimony before the Court and jury to the effect that the deceased, H. J. Myers, saw the flashing lights on the North American Van Lines truck immediately prior to the collision in question, and submission of such issue would create a greater burden on the plaintiffs than is required by law, that the testimony offered in this case is that there were directional lights being flashed at such time and not flashing lights, and the issue as framed does not set forth the true evidence or true wording so as to submit to the jury a correct issue should the defendant be entitled to same."

As indicated above, we think the evidence does show that there were lights flashing on the North American Van Lines truck. We are unable to distinguish as do the appellants in their objection to this portion of the charge, between "flashing lights" and "directional lights being flashed". The complaint leveled at Special Issue No. 8 by the above objection and by the argument thereunder by the appellants does not show that such issue created a greater burden on them than is required by law. The argument points to the fact that the flashing lights were on a truck

parked off the traveled portion of the highway would not give notice or warning of the existence of a truck blocking the traveled portion of the highway. That is as far as the argument goes. The argument does say that if Myers saw the directional lights on the Van truck when he was only 60 or 70 feet away from the stalled tank truck, his failure to slacken his speed before the collision would not have been failure to exercise ordinary care, because he could not have avoided the collision, and his failure to stop or slow down or turn to his right could not have been a proximate cause. We have examined carefully the objections made to this portion of the charge, and the subsidiary issues submitted thereunder, and do not find any objection on the basis that such evidence was insufficient to support the jury's finding of negligence and proximate cause on the part of Myers in failing to stop or slacken his speed or turn to the right after he saw the flashing lights on the Van truck. We do not believe this point presents any error and it is overruled.

■ By their 24th point the appellants complain of the trial court's action in overruling their objection to Special Issue No. 18 in the court's charge, which issue inquired whether Myers failed to keep a proper lookout for vehicles and obstructions on the highway in front of him immediately prior to the collision. Under this point the appellants say that all matters of lookout had been completely covered and submitted in other Special Issues in the charge, such as Issues Nos. 8, 12, 14, and 15, and the submission of such Special Issue No. 18 was thus undue repetition and emphasis upon the issue and duty of lookout. The previous issues mentioned by the appellants dealt with questions whether Myers saw the flashing lights on the Van Line truck and for failure to stop, slacken his speed or turn. No. 18, however, is directed to a different fact issue, that is, whether Myers failed to keep a proper lookout for vehicles and obstructions on the highway itself as distinguished from

seeing the lights on the Van truck. On the authority of City of Fort Worth v. Lee, 143 Tex. 551, 186 S.W.2d 954, 159 A.L.R. 125, it was not error to submit the additional question of proper lookout.

■ Appellants' point No. 25 reads as follows: "There is no evidence to support the submission of an issue as to whether the driver of the Younger Brothers truck was faced with an emergency when the Younger Brothers truck stopped on the highway because the act of stopping the truck at the time and place in question resulted from the act or acts of Younger Brothers, Inc. and/or William Jacob Mullis, the driver." The appellants present no authorities to support their contentions under this point. They say that since it is undisputed that the Younger Brothers truck had been operating without difficulty up to the time it approached the highway, and under all the evidence no issue of emergency arose, but if it did it was created by the acts of the driver himself. They say further that the evidence is undisputed that the driver had at least five minutes within which to put out warning signals on the highway, which he failed to do, and under these circumstances the existence of an alleged emergency would not present a defense to plaintiffs' action. This is all the appellants' brief contains under this point. Such point and argument present no error and the point is overruled.

■ Appellants' point No. 26 is that "there is no evidence to support the finding of the jury in answer to Special Issue No. 2, for the reason that the undisputed evidence shows that the defendant Mullis was guilty of negligence per se in blocking the traveled portion of the highway." Special Issue No. 2 of the court's charge was not concerned with whether Mullis was negligent in blocking the highway with his truck but inquired whether the failure of Mullis to put out warning signals was negligence. This point clearly presents no error and it is overruled without discussion.

We believe that the argument of counsel for the appellees, complained of under appellants' Point No. 14, was improper and prejudicial and amounted to such a denial of the rights of the appellants as was reasonably calculated to cause and probably did cause a rendition of an improper verdict and judgment in the case, and for that reason the judgment of the court below is reversed and the cause is remanded for a new trial.

Reversed and remanded.