MRS. ETTA MAE WADE ET AL V. TEXAS EMPLOYERS' INSURANCE ASSOCIATION.

No. A-3112. Decided December 5, 1951.
(244 S. W., 2d Series, 197.)

558

*Jimmy Phillips,* of Angleton, and *John L. Hill* and *W. J. Kronzier, Jr.,* and *Helm & Jones,* all of Houston, for petitioners.

It was error for the Court to grant a new trial upon the ground that during petitioners' counsel's closing argument he argued and insinuated that if there were no restrictions or rules of evidence that additional testimony could have been brought before the jury that would have been favorable to petitioners, and in holding that such argument was inflammatory, improper and prejudicial. King v. Federal Underwriters Exchange, 144 Texas 531, 191 S. W. 2d 856; Kimbell v. Noel, 228 S.W. 2d 981; Barnhart Mercantile Co. v. Bengel, 77 S. W. 2d 295.

*Rucks, Enlow & Key,* of Angelton, *Newton Gresham* and

*Sam H. Hood, Jr.,* and *Fulbright, Crooker, Freeman & Bates,* all of Houston, for respondents.

In response to petitioners proposition, cite Breckenridge v. Roberts, 114 Texas 418, 267 S. W. 244; Johnson v. Durst, 115 S.W. 2d 1000; Gray v. Cheatham, 52 S.W. 2d 762.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

Petitioners Wade et al as plaintiffs had judgment on a verdict in the trial court for Workmen's Compensation incident to an alleged industrial accident on the afternoon of April 12, 1944, whereby Henry G. Wade inhaled an excessive amount of chlorine gas while working as a painter for Dow Chemical Company at its Freeport, Texas, magnesium manufacturing plant and died from resultant bronchial pneumonia on April 15th following. On appeal of the defendant-respondent, Texas Employers' Insurance Association, the Galveston Court of Civil Appeals overruled all of its contentions except that of impropriety of the closing argument of counsel for petitioners, but on the latter ground reversed and remanded the case for a fifth trial. 236 S.W. 2d 836. Petitioners here ask, of course, for reversal of the reversal and for affirmance of their trial court award.

The essential matter in litigation was the factual one of whether Mr. Wade died from the accident alleged or from purely natural disorders of certain abdominal organs, which became critical just about the time of the alleged accident, this controversy including, moreover, a contest over whether the deceased in fact suffered an accident.

The alleged accident occurred just outside the ground floor of a large building, on which the deceased and nine others of a "paint crew" were working. The upper floor of the building, also very large, contained the "mag cells", or apparatus for "cooking" the magnesium, which were in operation at the time and evidently gave off some amount of chlorine gas, the workers who conducted the operation wearing gas masks, though the area was ventilated by large windows on the sides and suction fans designed to maintain a draught out through the ceiling. There was evidently no other source of gas except other and similar "mag cell" buildings quite close by. Some of the painters were working on scaffolds on the outside of the upper floor, but Mr. Wade, who was not permitted on scaffolds because of his age (about fifty nine years) and a chronic nervous affliction, was working at ground level, painting some hydrants

and one of the doors. The painters were not equipped with gas masks customarily or on April 12th, the date of the alleged accident.

The case for the plaintiff-petitioners was more or less as follows: The nearest thing to direct evidence of the deceased having inhaled an appreciable amount of gas was the testimony of two of his fellow-painters (Muesse and Gormey) that, on the afternoon of May 12th, there was an unusual amount of gas present and that Mr. Wade, while appearing to be ill, made statements such as "this gas is about to get me" (the latter being admitted as *res gestae*). Without reference to the medical testimony, there was, moreover, considerable evidence to the effect that, until about the time he thus inhaled the gas, he was in apparently normal health and vigor, but that, beginning promptly thereafter, he gave indications of critical illness, including various signs, such as red eyes, coughing and complaints of chest pains, suggestive both of an excessive inhalation of gas and acute bronchial disturbance. Much of this latter proof came from petitioners, Mrs. Wade (the widow) and Odel Wade (a son), and from a friend and co-employee of Mr. Wade named Ingle. From these witnesses, the petitioners made attempts before the jury to elicit evidence of post-accident statements of Mr. Wade in addition to mere complaints of pain, and at least in the case of Ingle, the testimony in view was obviously a repetition of Mr. Wade's earlier statements specifically asserting illness from gas. However, the testimony of these witnesses was largely restricted by the court to declarations of pain and its location.

The medical proof for petitioners was mostly that of a pathologist, who, some six weeks after Mr. Wade was buried, was retained to and did perform an autopsy, but also included that of a diagnostician, who had not seen Mr. Wade or his remains, but answered hypothetical questions based on the autopsy and the abovementioned "before and after" proof given by lay witnesses. This expert testimony supported the claim of accidental death. Petitioners also used, by way of rebuttal, some written testimony of a Dr. Rigdon, who had testified for respondent on an earlier trial.

The case for the respondent rested heavily on its evidence from Mr. Wade's own physicians, three in number, who alone attended him in his brief and last illness. This evidence included testimony of two of them, whose diagnostic interview with him and examination of him on the morning after the alleged ac-

cident ,supported the defense and negatived in effect any thought or complaint on the part of Mr. Wade that he was suffering from exposure to gas. Also included were the surgical findings of two of these physicians, who later on the same day performed a serious exploratory operation on him, their general conclusions resting in part on such findings.

The respondent also presented the witness, Yoakum, "leader" of the paint crew with which Mr. Wade was working, who testified that, during the afternoon of April 12th, Mr. Wade did seem to be indisposed but in conversation with the witness did not mention gas; that no one of the crew complained of or gave indication of being affected by gas; that he had seen Mr. Wade nauseated after eating on several occasions preceding April 12th, etc. Yoakum was the only witness from the rather large paint crew, aside from petitioners witnesses, Musse and Gormey. Petitioners introduced a sheet containing the full roster of the crew and also developed on cross-examination of Yoakum that some of them, who did not testify, were still working at the Dow plant at the time of the trial (though, of course, they were employees of Dow Chemical Company, not of respondent).

In connection with the argument, no objection was made on behalf of the respondent until (to quote from the qualifications to the bill of exception) :

"At the conclusion of said argument complained of and set forth in the defendant's Bill of Exception No. 2, and while the jury was leaving the box under the custody of the bailiff preparatory to retire to the jury room to consider their verdict counsel for defendant moved to the bench and advised the Court that he wished to make certain objections to the closing argument of Mr. Hill, counsel for plaintiffs. The Court advised counsel for defendant that he desired to let the jury go to the jury room and that he would treat such objections as having been made before the jury retired. The members of the jury were permitted to retire to the jury room, but were not given the documentary evidence introduced on behalf of both parties until after the conclusion of the motions filed on behalf of both parties as hereinabove set forth in the Defendant's Bill of Exception No. 2. At the conclusion of the defendant's motion, as hereinabove set forth, this Court overruled said motion on the ground that the objections were not timely made."

The motion of respondent prayed for a mistrial and alternatively an instruction designed to "cure" the alleged irregularities. The mentioned motion of the petitioners (evidently fol-

lowing that of respondent and also overruled) was that the jury be recalled and instructed not to consider the hereinafter discussed portions of their own argument, which, among others, were attacked by respondent. It recited that "counsel for defendant has expressed his unwillingness to call the jury back at this time," and such was evidently the fact, the jury having then been out for apparently some twenty or thirty minutes.

The portion of the argument quoted in the opinion below reads as follows:

"'Now Men, before I sit down I want to point out some of the evidence I think is relevant. You will keep in mind, I know, that Mrs. Wade has been consistent on this, she has told the doctor of the gas all of the way through, and this isn't something that she dreamed up, and they never denied it, she proved it to you, she proved to you there was gas, proved it to you by those witnesses, that in all probability he inhaled it and it brought on this process. Of course, she hasn't told you what he (Mr. Wade) said, that is not admissible testimony. She has been consistent when she told you of the symptoms he has, the cough, the burning eyes, and she hasn't been alone. Was Roy Ingle lying to you? Did he affect you that way? Has he got anybody's axe to grind? Oh, he told what was asked under the rules of evidence, and he told you those same things; he told you about the complaints that he had. Men, it is the little things that crop out in a lawsuit that give you a lot of life.'"

The court below evidently had also in mind, however, a further passage, said to deal with respondent's failure to call certain witnesses and appearing in the bill of exception as follows:

"'What about Dr. Rigdon, men? Analyze with me. We brought Muesse, we brought Gormey (Petitioners' witnesses who were members of Mr. Wade's crew on April 12, 1944). Analyze, men, think (holding up before the jury petitioners' exhibit No. 4, a list of employees in Mr. Wade's crew [S.F. 412] on April 12, 1944). For God's sake, think. Who brought the evidence and who left it undisputed? For God's sake think.'"

The two quoted excerpts are similar to the extent that both conceivably suggest to the jurors the existence of evidence not in the record, that is, (a) "evidence" of Ingle, Mrs. Wade and perhaps Odel Wade that the deceased, some hours *after* 3 P.M. of April 12th, repeated what his two fellow-painters actually testified he had said *at* 3 P.M., and (b) "evidence" from the

non-testifying painters both that there was excessive gas at the abovementioned hour and that the deceased had then said it was overpowering him.

On oral argument here, petitioners relied heavily on the point that any vice in the argument to the jury was waived by the conduct of counsel for respondent in not objecting at the moment the offending arguments were made but withholding the point until the entire argument was concluded and the jury about to retire. This, as we view it, must be treated simply as a contention that, assuming the argument to have been improper, it was yet such that any probable prejudice to respondent from it could have been forestalled by a corrective instruction from the court or perhaps a voluntary retraction or explanation by arguing counsel. For, if the argument was of this "curable" type, then, in the absence of some very unusual circumstances excusing an objection, the latter has to be made in time to attempt the cure. This being so, the simpler and more efficacious procedure is for it to be made at the very time the improper argument occurs, and, under the rule so pointedly recalled in Texas & New Orleans Railroad Co. v. Sturgeon, 142 Texas 222, 177 S.W. 2d 264, 266, the error would be waived by omission thus to object. If the argument was not of the "curable" type, not only would it be presumably prejudicial in its effect on the jury, but also it would justify the aggrieved party both in forebearing to object at any stage of the trial and in withdrawing any request he may have made for a "curative" instruction (as respondent did in the instant case).

It is true that some seventy years ago this court broadly held, that by the terms of District Court Rule No. 41 (published in 47 Texas at p. 625), the objection by counsel to improper argument was not a matter of duty which might result in a waiver, but simply an option, which counsel was permitted to exercise only when the judge or arguing counsel himself should fail to take note of the error. Willis & Bro. v. McNeill, 57 Texas 465, 474. The character of the argument as "curable" or "incurable" was not mentioned, since the rule did not mention it. It is also true that Rule 41 was in exactly the same terms as its modern counterpart, Rule 269 (g), Texas Rules of Civil Procedure, and that Willis & Bro. v. McNeill has never been overruled. However, its effect has been tacitly limited to situations in which argument was of the "incurable" type. Ramirez v. Acker, 134 Texas 647, 138 S.W. 2d 1054. And, as typified by this latter decision, the modern rule requires timely objection, on penalty of waiver, if the offending argument is "curable."

This view apparently originated in 1888 with the statement of then Assocate Justice Gaines in Gulf C. & S. F. R. Co. v. Greenlee, 70 Texas 553, 8 S.W. 129, 131, that "without passing upon the question whether the language is of such a character as would require a reversal under any circumstances, we will say that the remarks were not so plainly prejudicial to defendant as to demand that the verdict be set aside, in the absence of an objection by its counsel at the time the words were spoken." (See the Sturgeon case, supra, 177 S.W. 2d at p. 266). The words "not so plainly prejudicial" were, of course, not idly used. The kind of argument involved does not appear from the opinion but is shown by the record in our files to have consisted of statements by plaintiff's counsel to the effect that he was a railroad attorney himself and knew that railroad engineers and surveyors always testified favorably for the railroad, whatever they might know the real facts to be.

Since the Greenlee case, particular arguments have been held "curable" and others "incurable," but the distinction has always been one of difficult application, and few general guiding principles therefor have emerged. In 1943, the late Hon. Earl Cox, who lectured and wrote extensively for our bar on the matter of jury argument, called the subject one "which has proven quite troublesome." He then deduced from the decisions that the distinction might be grounded on the difference between improper argument which is "inflammatory," as in Ramirez v. Acker, supra, and on the other hand, argument, "bringing before the jury information that they do not have and under the law are not supposed to have," the latter being considered "incurable," and the former "curable." 6 Tex. Bar. J., 536, 554. And whatever basis or lack of basis in human experience there may be for saying that an instruction (a) will dispel aroused passion but (b) cannot eradicate the effect of suggested information from outside the record, the arguments held to require objection do seem to be largely of the Ramirez v. Acker type and the ones held "incurable" to be largely of the "imaginary testimony" type. See, for example, Robbins v. Wynne, Tex. Com. App., 44 S.W. 2d 946, and Johnson v. Durst, Tex. Civ. App., 115 S.W. 2d 1000, 1006, er. dism., in which the argument suggested that certain corroborative testimony would have been adduced but for a possible witness feeling morally obligated not to testify or but for the so-called "Dead Man Statute." Vernon's Ann. Civ. St. Art. 3716. But in a general sense most all improper argument is the same, in that it appeals, whether by passion, the suggestion of "imaginary testimony" or otherwise, to something other than the evi-

dence in the case. Considering this and the length to which we have gone in holding strong appeals to prejudice to become harmless when the jury is instructed to disregard them, it is logical to require prompt objection in the "imaginary testimony" type of case if the character or effect of the argument is doubtful. This view finds support in Judge Gaines' language in the Greenlee case, supra, and we consider it the necessary effect of King v. Federal Underwriters Exchange, 144 Texas 531, 191 S.W. 2d 855, 856. In the latter, an argument said:

"I was trying to put that in and Mr. Thompson objected to it. If I had put that in there, how do you know what Dr. Smith would have said? He might have said 'yes', if I had got that in there."

The instruction was, "The jury won't consider what Dr. Smith's testimony would be."

This court briefly held: "Clearly the harmful effect, if any, of the argument above referred to was removed by the instructions of the Court."

The argument last mentioned was obviously not as dangerous as some of the same general type which have been held "incurable". But that is the very point suggested in the Greenlee case. We judge by the degree of the vice, not merely the subject matter of the argument.

■ In the instant case the possible reference to what the surviving Wades and Mr. Wade's friend Ingle would have testified was at most but a prejudiced corroboration that Mr. Wade had made certain statements already strongly in evidence from presumably impartial witnesses (Muesse and Gormey). Such reference, moreover, was quite vague, and might very well not have had the effect attributed to it by respondent. That latter observation is also true (if to less degree) as to the second excerpt of the argument heretofore quoted. Obviously, "sign language" stands on no safer basis than forthright words, but its effect is not necessarily different. Assuming that no comment could rightfully be made on the fact that respondent had not offered the testimony of any of the paint crew except Mr. Yoakum, the argument was not so patently such a comment— "not so plainly prejudicial"—as that its harmful effect, if any, could not be "cured." The language could not unreasonably have been understood as a mere claim that petitioners' evidence of the existence of gas was undisputed, or as emphasizing by reference to the list of the painters that petitioners' witnesses

Muesse and Gormey were undoubtedly present on the job at the time. We therefore conclude that the error, if any, in the argument was waived by failure of the respondent to object to it when it was made.

■ We are still of the opinion reached on granting the writ of error, that the reversal cannot be supported on the ground, rejected below, that the trial court erred in admitting as part of the *res gestae* the declarations of Mr. Wade proved by the witnesses, Muesse and Gormey. Conceding that Mr. Wade was "ill" at the plant during the morning of April 12th, such would not, under the peculiar facts of this case, necessarily make his declarations of that afternoon the narration of a past event occuring in the morning. See Texas Law of Evidence, McCormick and Ray, sec. 433. Whatever the cause of his being unwell in the morning, if he had at á given moment in the afternoon said that he was then and there being overcome by the inhalation of gas, surely such declaration would be admissible evidence of an injury received from gas at that time, and this is substantially the evidence admitted. The situation is accordingly quite different from those involved in Pacific Mutual Life Ins. Co. v. Schlakzug, 143 Texas 264, 183 S.W. 2d 709, and City of Houston v. Quinones, 142 Texas 282, 177 S.W. 2d 259, in both of which there was no contention that the injury was received at or about the time of the declaration. Here the petitioners' case was not pitched on an injury received in the morning but rather on one occurring at some undetermined time during the work day, probably about the very time Mr. Wade, giving signs of illness, said "This gas is about to get me."

The judgment of the Court of Civil Appeals is reversed and the judgment of the District Court is affirmed.

Opinion delivered December 5, 1951.