**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Appellant,**

**v.**

**Anne BRENNAN, Appellee.**

**No. 13449.**

Court of Civil Appeals of Texas.

San Antonio.

April 29, 1959.

Rehearing Denied May 27, 1959.

Clemens, Knight, Weiss & Spencer, San Antonio, for appellant.

Pat Maloney, Jack Pasqual, San Antonio, for appellee.

POPE, Justice.

John Hancock Mutual Life Insurance Company, insurer, sued Anne Brennan to cancel a mortgage redemption policy issued upon the life of Joseph P. Brennan, the deceased insured. Brennan died September 9, 1957, just a few months after the policy was issued. According to the death certificate, asthma caused his death. Insurer pleaded that the insured made numerous intentional misrepresentations. Anne Brennan, the widow, denied those allegations and by cross-action asked for judgment upon the policy. The jury answered seventy-seven special issues, and the court then entered judgment upon the verdict against insurer for the amount of the policy, plus penalty and attorney's fees. Insurer, by appeal, now urges that the evidence, as a matter of law, supported its allegations of fraud and that the court erred in overruling its motions for instructed verdict and for judgment non obstante veredicto.

We take note of the fact that insurer's points on appeal do not complain of many of the findings, and we therefore do not discuss them nor the evidence which supports them. We are of the opinion that some of the issues inquired about evidentiary matters, but that objection was not urged.

During February, 1957, insurer's agent visited insured at his home in San Antonio concerning the insurance policy. On March 1, insured was examined by Dr. E. E. Welch, the insurer's medical examiner. The medical application shows that insured, in reply to questions, stated that he was in good physical condition and, except for a routine chest X-ray and a head cold three years earlier, had suffered no illnesses of any kind and had not been treated by physicians. The application was in the physician's handwriting but was signed by insured. The true facts were that insured, during June, 1956, was rushed to Baptist Memorial Hospital in San Antonio because of hemorrhage from a duodenal ulcer. While there it was learned that he also had diabetes. He was given insulin while in the hospital, and was treated by Doctors Gordon and Sutton. After five days, insured was transferred to

Brooke Army Hospital, where records were made showing that insured suffered from diabetes, an ulcer, and perennial asthma. Insured was discharged on July 11. The following November, he consulted Dr. Mueller in San Antonio, who, after laboratory tests, found an excess of sugar in insured's blood. Dr. Mueller treated insured for a mild case of diabetes through February, 1957, when he first began discussing the insurance policy with insurer. A few weeks before insured applied for the insurance he was turned down by Equitable Life Assurance Society. If this were all the evidence, we would sustain the insurer's points that there were misrepresentations.

After Dr. Welch sent in his medical report, insurer made inquiry from a medical information bureau and obtained confidential information that indicated Brennan had "asthma, primary or allergic, suspected, questionable or doubtful," "duodenal ulcer, hemorrhage, but no operation within the past year." When the insurer received that information, its Dr. Warner, vice-president and medical director in Boston, wrote Dr. Welch on March 27, 1957, advising that the Company had confidential information which "leads us to believe that applicant has been troubled with ulcers in the past," and gave instructions for a more thorough examination and investigation, including the names and addresses of attending physicians. Dr. Warner also asked Dr. Welch to review any history of asthma and to furnish full details.

After receipt of this additional information from Boston, Dr. Welch, on April 5, 1957, returned to the Brennan home for further examination and information. Dr. Welch on this second examination wrote his findings on the back of Dr. Warner's letter and returned it. The second medical report states that insured denied any ulcer therapy, but that he had indigestion about two years earlier; he denied that a physician had treated him, except that a Dr. Johnson had treated him for sneezing and

irritation of sinuses by giving him meticorten. Dr. Welch reported that he could hear whistling sounds over the chest. He circled the word "meticorten," and testified that he did this because it would be administered only in extreme cases, and he especially wanted Dr. Warner to notice this treatment. Dr. Welch stated that he learned that Brennan probably had an attack of asthma between the time of his first and second examinations. On April 24, an agent for insurer went to the Brennan home with the policy and explained to him that he would have to pay almost $100 above the usual premium. Insured had previously paid an advance premium of $328.56. This additional premium was charged, as explained by the agent who delivered the policy to Brennan, to cover the "medical history as our Company developed it."

From this sequence of events, it becomes apparent that the Company was no longer acting upon the original application nor upon the first medical examination made by Dr. Welch, but upon the further information, another examination, and its own investigations. The insurer had information which prompted it to require a higher premium or not deliver the policy.

█ Insurer, throughout its argument, concludes that the original application which was in Dr. Welch's handwriting, but signed by insured, as a matter of law, was fraudulent. But the policy was not delivered on the basis of the original application. The insurer refused the original application and submitted a counter offer. Its requirement that insured meet terms and conditions different from those covered by the policy issued on the original application and its proposal of a different contract, was a rejection of the original proposition, and was a counteroffer. Republic Nat. Life Ins. Co. v. Hall, 149 Tex. 297, 232 S.W.2d 697, 699; United Fidelity Life Ins. Co. v. Handley, Tex.Com.App., 126 Tex. 147, 86 S.W.2d 201. We may not close our eyes, nor could the jury, to the events

which occurred subsequent to the time of the original application, and to the disclosures made by insured prior to the time the contract was concluded.

█ The jury found against insurer on most of its charges against insured of intentional misrepresentation. It found that he did not misrepresent that he had been told that he had diabetes or had been treated for diabetes, or for asthma, or that he had been confined in a hospital or clinic within the past five years. The jury found against insurer on several other claimed misrepresentations which are not briefed. There was evidence which supported each of these findings that insured did not make an intentional misrepresentation. Mrs. Brennan testified about the second medical examination by Dr. Welch. She stated that she heard Dr. Welch discussing the meticorten which Dr. Johnson had prescribed, that Dr. Welch said while there: "I don't care what you call it, but it's asthma to me." Dr. Welch and insured talked about the hospitalization, and she said that her husband told Dr. Welch about his being in Brooke Army Hospital and about his diabetic condition in 1956. She testified: "Yes. He told him the whole thing. He told him about them suspecting that he had this ulcer and this diabetic condition, and that they suspected it was because he had taken this meticorten for this asthmatic condition that he had * * *." She said that in Dr. Welch's presence, her husband told her that Dr. Welch thought he should take Empirin compound, that she is a nurse and that she questioned Dr. Welch if he had not advised too large a dose, but Dr. Welch said it would not hurt. Dr. Welch advised insured to change his job and his place of residence. Mrs. Brennan also testified that the Company agent told them, when he delivered the policy, that the additional premium was required because of the "medical findings and history that his Company discovered." Insurer, more or less, ignores Mrs. Brennan's testimony. She distinctly testified that there was dis-

closure of diabetes, asthma, and prior hospitalization, just as the jury found. Dr. Welch reported the meticorten prescription and wheezing to his superiors, and the jury, by separate issues, found that Dr. Welch actually knew of the asthmatic condition, and that Dr. Cahall, insurer's Boston medical adviser, actually knew of insured's former hospitalization and treatment by other physicians. Asthma, according to the jury, was a reason for the increased premium. From this evidence, insurer knew about the asthma; insured died of asthma, and he was insured for asthma.

█ Concerning the diabetes, we note that one of insurer's issues was whether diabetes caused or contributed to insured's death. The jury answered in the negative. Insurer argues that the real issue was whether it would have issued the policy had it known of the diabetes, and not whether it caused or contributed to cause death. Insurer will not now be heard to complain that the materiality issue was improperly phrased, since it was requested by the insurer and was submitted in the exact words of the request. There should be no cancellation which is grounded upon an immaterial misrepresentation. American Central Life Ins. Co. v. Alexander, Tex.Com.App., 56 S.W.2d 864; 24–B Tex. Jur., Insurance, § 176; Art. 21.18, Insurance Code, Vernon's Tex.Civ.Stats. The evidence supports the finding. The attending physician at death did not ascribe death to diabetes, and during his last illness insured was not treated for it. One of his physicians stated that his condition could probably be controlled by diet alone.

█ We come now to the claimed ulcer. The pertinent jury findings are that the jury found that insured made the misrepresentation that he had never been treated for ulcers, and that it was intentionally made. The jury also found that he made a misrepresentation that he had received no ulcer therapy, and that too was intentionally made. But the jury found, with respect to those misrepresentations,

that the insurer did not rely upon either of them. The jury found that Dr. Cahall, insurer's assistant medical director in Boston, knew that insured had been treated by physicians for a duodenal ulcer, and that Dr. Cahall further knew that insured had been treated or confined in a hospital.

These findings have support in the evidence. Dr. Cahall testified at the trial. He said he had information from a confidential bureau which serviced insurance companies. Dr. Warner, the company medical adviser, on March 27, wrote Dr. Welch that he had confidential information "which leads us to believe this applicant has been troubled with ulcers in the past." The jury found also that the insurer charged an additional premium because of the ulcer. Dr. Cahall testified that the insured was rated upward because insured's history "would definitely indicate that there was a degree of asthma * * * plus a question * * * definite question of indigestion with this code of an ulcer a year before." Hence, there was evidence from which a jury could conclude that the company did not rely upon any false information, that the company had the information, wrote letters about it before it delivered the policy, and charged a premium for it. The evidence supports the idea that the company did not deliver the policy until it caused Dr. Welch to make further inquiry, and not until after Dr. Warner and Dr. Cahall knew about the hospitalization and the ulcer, and not until the Company made a counteroffer to deliver the policy upon payment of a higher premium.

■ Finally, the jury found that the insurer actually did conduct an independent investigation, and that it relied solely upon that investigation. These findings, too, are attacked as having no support in the evidence. According to the death certificate, it was not diabetes nor ulcers, which caused the death, but asthma. Certainly, that is the one thing that the evidence discloses was revealed by Dr. Welch's second examination. Apart from the medical find-ings and history discovered by Dr. Cahall and Dr. Warner from the confidential medical bureau, Dr. Welch, on his second medical examination discovered whistling, which he testified evidenced an asthmatic attack between his first and second examinations, and was impressed by the prescription of meticorten, which indicated "serious straits." The jury found that Dr. Welch knew that insured had a serious asthmatic condition. The evidence supports the conclusion that either Dr. Welch, the San Antonio medical adviser, Dr. Warner, the Company vice-president, or Dr. Cahall, knew the truth and every fact upon which the insurer now relies to prove misrepresentation, except the presence of diabetes which was immaterial. What one did not know, according to the jury and the evidence, the other did.

The jury found that there were misrepresentations, but that the insurer knew about them and did not rely upon them. "Clearly after it (the insurer) knew of the falsity of the deceased's answers it did not rely upon them, and its delivery of the policies was the result of its own further investigation, and rested wholly within its own discretion, uninfluenced by the false answers." Dossett v. Franklin Life Ins. Co., Tex.Com.App., 276 S.W. 1097, 1099.

One final point is that counsel for Mrs. Brennan committed reversible error in arguing to the jury that deceased was not present to testify, that his death was the most tragic thing that ever happened to Anne Brennan, that she is trying to forget it so she can make a living for her children, that a mortgage is the thing that most of us are worrying about, that Dr. Cahall from Boston was staying in the St. Anthony Hotel, and he sounded from the evidence more like a bookie than a doctor, that he gathered from his testimony that he had not come down from Boston to spend three nice days at the St. Anthony to jeopardize his career with the Company, and that the attitude of Dr. Cahall was that of coming to San Antonio to prove that Brennan was a liar, even

if the San Antonio jury thinks the Company is a robber.

In answer to these arguments, counsel for Mrs. Brennan says that, in context, they have a different meaning. He states that insurer developed evidence that Anne Brennan was a nurse, that deceased once sold insurance, and that he understood about mortgage insurance. Mrs. Brennan's counsel in argument stated that when deceased was selling insurance, twenty or thirty years earlier, for a period of only three months, there was no point in going out to sell a policy to save one's home. "That is the last thing he ever had, isn't it? Mr. Coffey explained to you in '45 when the Government started guaranteeing the insurance companies the loan, we all could worry about mortgages. Now I suppose that is what we are all worrying about is the mortgage."

The reference to Dr. Cahall as a bookie was from this argument: "He comes up here, and he explains to me that he went to school, a school of medicine and that he is in the healing arts, and the next thing I knew, well, he was whipping out his little code sheet, you remember, giving code numbers. The next thing he had, he had a little work sheet; remember the little work sheet with all of the little dots on it? Then he calculated 160 per cent and all that business. Ladies and gentlemen, I am going to be honest with you. He sounded to me from the evidence more like a Boston bookie than a doctor. I didn't get the impression he was a doctor at all."

The evidence had shown that when insured paid the additional $100 premium in order to obtain the insurance, he protested that it was "robbery." This was freely and fully testified about. The remark that Dr. Cahall was trying to prove insured was a liar is strong language but this is a case of claimed intentional frauds. The remark that Dr. Cahall cared little if the people thought the Company was a bunch of robbers must be taken in conjunction with the evidence that when the policy was de-livered insured had, with an oath, declared that the additional charge was robbery.

 During the argument, all of these statements were made without objection. There was no opportunity for retraction or for instruction. As the Supreme Court has stated, one may not "lie in wait," and then complain about an adverse result. Texas Employers' Ins. Ass'n v. Haywood, 153 Tex. 242, 266 S.W.2d 856, 858. In our opinion the arguments, upon objection, could have been stopped or cured. Wade v. Texas Employers' Ins. Ass'n, 150 Tex. 557, 244 S.W.2d 197; Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054.

The judgment is affirmed.