TEXAS EMPLOYERS INSURANCE ASSOCIATION, Appellant,

v.

Arthur J. LOESCH, Appellee.

No. 5524.

Court of Civil Appeals of Texas, Waco.

May 13, 1976.

Rehearing Denied June 3, 1976.

Naman, Howell, Smith & Chase, Louis Muldrow, Waco, for appellant.

Dunnam, Dunnam, & Dunnam, W. V. Dunnam, Jr. and Fred Horner, Waco, for appellee.

OPINION

JAMES, Justice.

This is a workman's compensation case. Pursuant to jury trial the trial court entered judgment in favor of the Plaintiff-Appellee Arthur J. Loesch for total and permanent disability benefits. We affirm.

Plaintiff Loesch was employed at General Tire and Rubber Co., in Waco, Texas. He received an accidental injury while on the job on May 8, 1963.

Trial was to a jury which found:

(1) That Plaintiff Loesch sustained an injury to his body on May 8, 1963;

(2) that such injury was accidental;

(3) and in the course of employment for General Tire and Rubber Co.;

(4) that such injury resulted in total incapacity;

(5) that such total incapacity began on May 8, 1963; and

(6) that such total incapacity was permanent.

As stated, pursuant to such jury verdict the trial court entered judgment in favor of Plaintiff Loesch against Appellant Texas Employers Insurance Association for total and permanent disability benefits, from which Appellant insurer appeals.

Appellant asserts that there is no evidence, and insufficient evidence, to support the jury's findings that Plaintiff-Appellee Loesch sustained total and permanent incapacity which began on May 8, 1963. We do not agree.

At the time of trial Arthur J. Loesch was forty-two years of age, was married, and the father of three children. He had a tenth grade education. At all times material to this controversy he was employed by General Tire and Rubber Co. at Waco, Texas. At the time of May 8, 1963, he was employed as a truck tire builder. Plaintiff had not acquired any particular skills by way of education, and his work background was such that he was obliged to earn his living by manual work. Plaintiff injured his back on May 8, 1963, while building truck tires, and this is his account of how it happened:

"Well, we were using—we're still using rayon fabric and we had these four-ply rayon bands which were—well, we use a band bar to run those bands on the drums, and you have to bend down and put pressure on them while the drum is spinning and sort of screw them on there, and these bands were unusually stiff. I mean, they wouldn't stretch very easy, and I got one that was just out of the ordinary, it was real thick stock. I don't know why. And heavy, and it wouldn't stretch, and I had the thing about halfway on there and it started to hang the bar, and I don't know whether you know what happens if a bar

hangs. Lots of times it will throw you about twenty or thirty feet, and it was about to hang this bar, and there wasn't nothing that I could do except just bear down with all I had, and I did, and I got it on there, but when I raised up it felt like a knife sticking in my back, and I couldn't even walk. They had to carry me to first aid on a little truck—wagon."

Some co-workers put him on a "skid" (or small truck that the workers get material on) and carried him about 200 yards to first aid. At the first aid station, he was put upon a stretcher, after which he came under the care of Dr. Harry Trippett. Plaintiff was totally disabled for thirteen weeks following this injury, and went back to work sometime the latter part of August, 1963, doing light work.

Dr. Trippett's medical records showed that Plaintiff's back was X-rayed on the date of his injury, May 8, 1963, which X-rays showed "no evidence of a fracture or dislocation of the visualized bones." Dr. Trippett saw him on May 13, 1963, June 13, 1963, December 29, 1965, and February 10, 1966. On December 29, 1965, Dr. Trippett X-rayed Plaintiff's back a second time, showing, "no evidence of a fracture or dislocation of the visualized bones," and "no change since 5–8–63."

Dr. Trippett referred Plaintiff to Dr. Robert Gassler, who first examined Plaintiff on May 21, 1963, and gave Plaintiff an injection. Plaintiff testified that Dr. Gassler told him (Plaintiff) that it was only a "pulled muscle." Between May 21, 1963, and August 6, 1963, Dr. Gassler saw Plaintiff seventeen times, at which visits Dr. Gassler observed and gave injections to Plaintiff and caused him to be treated with diathermy. Dr. Gassler examined Plaintiff on March 2, 1965, and saw him again on April 3, 1965, after which said doctor again examined Plaintiff on January 6, 1966. Dr. Gassler's records further showed that he examined and X-rayed Plaintiff on February 8, 1971, examined him again on February 12, 1971, and saw him the last time on February 19, 1971. From the record it appears that neither Dr. Trippett nor Dr. Gas-

sler ever ran a myelogram on Plaintiff's back. After the original injury of May 8, 1963, Plaintiff was sent to Dr. Trippett by his employer, said doctor having been paid by the insurance carrier. In turn, Plaintiff was referred to Dr. Gassler by Dr. Trippett, and Dr. Gassler was paid by the insurance carrier through the 1963 treatments. It was not until after the March 2, 1965, examination that Dr. Gassler began sending statements for his services directly to Plaintiff. Neither Dr. Trippett nor Dr. Gassler testified in the case.

As stated before, Plaintiff was totally disabled for thirteen weeks after May 8, 1963, after which time he went back to work doing light work as a "flapper" on the final inspection line during the fall of 1963. Somewhere about January 1, 1964, Plaintiff went back to building truck tires, at which work he remained until 1971, except for about six weeks of lighter work building passenger tires in the interim.

At the time of his injury of May 8, 1963, Plaintiff had a wife and three children at home, the ages of which children at the time were ten, eight, and six. The youngest child was a boy who was a hemophiliac (bleeder) and who also had a deformed left leg and foot. The boy was crippled and had to walk with crutches. Plaintiff testified that treatments for the boy were expensive, and he had a lot of unpaid bills at the time of the 1963 injury, and has continued to have many bills ever since for the boy's medical treatment.

Plaintiff testified that from the time he went back to work in the fall of 1963 and thenceforward he was doing his job but "was hurting also." In essence, Plaintiff testified that he was in pain practically all the time, sometimes worse than at other times; moreover, it grew progressively worse as time went on. He further testified that he hurt his back additionally many times both on and off the job during the years from 1963 through 1971. Finally, by the early part of 1971, Plaintiff's condition had reached the point that, as he testified: "I had got to the point where I couldn't sleep at night, I had to get up and go to the bathroom about every 15 minutes, and my stomach hurt and it was always upset and I was nervous." He had pain in his left leg and foot that also caused his toes to "go to sleep." The treatment that he had received from Drs. Trippett and Gassler had not caused his condition to improve. In an effort to relieve the pain, the upset stomach, and the bladder condition, Plaintiff went on his own to Scott and White Clinic and Hospital at Temple, Texas, beginning on February 23, 1971. The records of Scott and White showed their diagnosis to be a "herniated nucleus pulposus" in Plaintiff's back between L–4 and L–5, commonly known as a ruptured disc. A myelogram was done by Scott and White upon Plaintiff's back. This diagnosis further showed that the bladder trouble was secondary to his back trouble. On or about May 9, 1971, Plaintiff was operated on at Scott and White for this ruptured disc. In the fall of 1971, Plaintiff re-injured his back and was re-admitted at Scott and White, at which time it was determined that Plaintiff had suffered another ruptured disc.

Dr. Robert L. Stockton, a neurosurgeon, testified that he first saw Plaintiff on August 21, 1972. In response to a hypothetical question which fit the facts of Plaintiff's case, Dr. Stockton testified that the injury of May 8, 1963, in reasonable medical probability was the cause of the ruptured disc found in Plaintiff's back in 1971 at Scott and White Hospital. He further testified that medical doctors who conduct pre-employment physical examinations for employers will not pass a man who has a ruptured disc in his spine; that a man with a ruptured disc who stands on his feet and works seven or eight hours every day will aggravate and worsen his physical condition; that a man might have the physical power to work while at the same time he may not be medically able to do so. Dr. Stockton interpreted the Scott and White diagnosis to mean that Plaintiff's ruptured disc was "so bad that it was compressing on the nerve roots that control the urinary bladder." Also, that the longer period of time that there is nerve root compression from a ruptured disc, the more likelihood that addi-

tional damage will occur; and that a man with a ruptured disc is not medically able to be carrying on work that requires him to be standing on his feet hours at a time and doing lifting, bending, and turning as a part of his job. Dr. Stockton testified that on September 1, 1972, he released Plaintiff to go back to work on September 5, 1972, with the restriction that "he is not to lift more than ten pounds;" that he placed this restriction on Plaintiff because Plaintiff had a "significant medical impairment."

Charles Holley, a general construction contractor, testified that a man with a ruptured disc in his back cannot obtain employment in the construction industry; that a man to perform the usual tasks of a workman has to be able to crawl, bend, stoop and twist his body.

Defendant-Appellant sought to impeach Plaintiff by showing Plairtiff applied for and collected from Equitable Life Assurance Society $85.00 per week total disability benefits during several months in 1971, upon Plaintiff's representation that his disability was not connected with or due to his employment. Also, that Plaintiff applied to Trans-Texas Life Insurance Company on March 12, 1971 for similar-type benefits. However, Plaintiff answered this by saying that he applied for these benefits because of his stomach and bladder trouble, and sciatic trouble in his left leg and foot, not knowing that these troubles were being caused by his back trouble.

Harold D. Menafee, Chairman of the Safety Committee at General Tire and Rubber Co. for twenty-one years, testified that no workman can obtain employment performing the usual tasks of a workman from any major employer without first submitting to a pre-employment physical examination; that no major employer would employ a man who has a ruptured disc in his back; that the usual tasks of a workman require varying degrees of strain to the lower back; that a strong or normal back is essential for performance of the usual tasks of a workman.

From our careful examination of this record, we are of the opinion that the evidence is legally and factually sufficient to support the jury's findings that Plaintiff-Appellee Loesch sustained total and permanent incapacity which began on May 8, 1963.

Appellant complains of the trial court's submission of Special Issue No. 5, wherein the jury was asked upon what date the total incapacity for work began, to which the jury answered, May 8, 1963. In this connection, Appellant requested a special issue worded as follows:

"What do you find from a preponderance of the evidence to be the beginning date or dates, and the duration of each period or periods of such total disability?

| Beginning date(s) | Duration in weeks, or 'Permanent' |
|---|---|
| 1. _____ | 1. _____ |
| 2. _____ | 2. _____ |
| 3. _____ | 3. _____ |

Appellant admits in its brief that Plaintiff sustained some period of total disability immediately following the injury of May 8, 1963; that after Plaintiff's back surgery at Scott and White in 1971, that he sustained another period of total disability; and that under the testimony of Dr. Stockton the jury could reasonably have found that from 1972 on down to the present, that Plaintiff has sustained some total incapacity. Moreover, Appellant admits that under the testimony of Dr. Stockton, the jury could also have found that at the time of trial Plaintiff's total incapacity was permanent. This being so, Appellant asserts error because the jury did not have an opportunity to find, under the charge, multiple or interrupted periods of total incapacity. In other words, Appellant says the jury might have wished to find during the intervening period of time (between 1963 and 1971) that there was no total incapacity, but that the jury was deprived from doing so. Appellant also complains of the trial court's submission of Special Issue No. 6, wherein the jury was asked whether the total incapacity was "permanent" or "temporary", asserting the issue should not have been submitted disjunctively. As we understand Appel-

lant's contentions, the jury should have been permitted to find intermittent periods of temporary total disability between 1963 and 1971, "followed or interrupted either by periods of no incapacity or only partial incapacity, and eventually followed by another period of total, permanent incapacity." We overrule these contentions.

The jury found in answer to Special Issue No. 4, that the May 8, 1963 injury resulted in total disability; in answer to No. 5 that the total disability began on May 8, 1963; and in answer to No. 6 that the total disability was permanent. *Rule 277*, Texas Rules of Civil Procedure, as amended effective September 1, 1973, expressly provides: "Inferential rebuttal issues shall not be submitted." Said rule further provides:

"The court may submit an issue disjunctively where it is apparent from the evidence that one or the other of the conditions or facts inquired about necessarily exists. For example, the court may, in a workmen's compensation case, submit in one question whether the injured employee was permanently or only temporarily disabled."

Moreover, Rule 279, T.R.C.P. provides: "Where the court has fairly submitted the controlling issues raised by such pleading and the evidence, the case shall not be reversed because of the failure to submit other and various phases or different shades of the same issue."

In the case at bar, since it was undisputed, and the jury found, that the injury beginning May 8, 1963, resulted in total disability, the controlling issue then was whether the total incapacity was permanent or temporary. See *Stone v. Texas Employers Insurance Association* (1954), 154 Tex. 21, 273 S.W.2d 59. The jury found the total disability permanent, which finding rendered Appellant's requested findings immaterial, or at best inferential rebuttal issues.

If the jury had answered Special Issue No. 6, "temporary", the court conditionally submitted the issue (No. 7) inquiring how many weeks the total incapacity has or would continue. Then, by Special Issue No. 8, the court unconditionally submitted the issue as to whether the May 8, 1963 injury resulted in any partial incapacity, and if so, when did it begin (No. 9) and how many weeks has it or will it continue (No. 10).

■ We believe and hold that the trial court fairly submitted the controlling issues in the case at bar, and that Appellant was not entitled to its requested submission of multiple periods of incapacity.

Appellant complains by eight points of error of Plaintiff's attorney's voir dire examination of the jury panel, asserting that Plaintiff's attorney "engaged in vicious and unwarranted attacks upon the insurance carrier, its attorneys, the employer, the alleged 'insurance doctors', and even prospective jurors who might not be inclined to accept the plaintiff's contentions." Appellant asserts that Plaintiff's counsel indicated that the defense attorneys and the Defendant wanted to and would deceive, mislead, and confuse the jury regarding the facts and issues in the case; that the Defendant insurance company did not want to abide by the terms and provisions of its policy and the law, and was attempting to avoid liability by evasion, confusion, and deception; that the Defendant insurance company and the "insurance doctors" engaged in sinister and malicious conspiracies to defeat the Plaintiff's claim by "knowingly" concealing Plaintiff's "true" condition from him; and sought to intimidate the prospective jurors by indicating that they were dishonest or gullible if they "swallowed" the Defendant's contentions.

■ It has been held that a broad latitude should be allowed counsel on voir dire examination of a jury panel in order that peremptory challenges may be exercised, and that such examination is a matter within the discretion of the trial judge whose judgment in the matter will not be reviewed on appeal unless it clearly appears that his discretion has been abused. *Fort Worth and D. C. Ry. Co. v. Kiel* (Tex.Civ. App. Fort Worth CA 1946), 195 S.W.2d 405, NRE; *Lubbock Bus Co. v. Pearson* (Tex. Civ.App. Amarillo CA 1955), 277 S.W.2d 186, NRE; *Fenton v. Wade* (Tex.Civ.App.

Fort Worth CA 1957), 303 S.W.2d 816, NRE; *Levermann v. Cartall* (Tex.Civ.App. San Antonio CA 1965), 393 S.W.2d 931, NRE; 35 Tex.Jur. 2, "Jury", par. 102, p. 155 and pars. 117 and 118, p. 173 et seq.

In the case at bar, the voir dire examination by Plaintiff's counsel consists of 84 pages in the statement of facts. The voir dire examination of the Defendant is not in the record, and therefore we are not in position to determine to what extent, if any, Plaintiff's voir dire examination was answered, mitigated, or neutralized by Defendant's voir dire examination. Plaintiff's attorney made voir dire examination (containing some of the matters Defendant now complains of) that consumed eight pages before Defendant made an objection, at which time no request for instruction to the jury panel was made not to consider Plaintiff's counsel's remarks. The trial court took no action on this objection. Then Plaintiff's counsel continued with his examination of the panel (making additional remarks now complained of) until page 32, when Defendant's counsel objected for the second time, complaining of improper voir dire examination, which objection the trial court sustained, and at which point Plaintiff's counsel said, "Well, we'll agree not to go any further." Again, no request was made for the court to instruct the jury panel not to consider Plaintiff's counsel's remarks. Plaintiff's counsel proceeded with his examination of the jury panel without interruption until page 54, when Defendant's attorney objected to one of the remarks now complained of, again without making a request for the trial court to instruct the panel not to consider it. At this point the Defendant moved for a mistrial outside the presence of the jury, which motion was overruled by the trial court. Plaintiff's counsel thereafter resumed his examination on page 56 which continued without objection to page 84.

We believe it is significant that after the motion for mistrial was made, Plaintiff's examination was largely free from the remarks now complained of by Defendant, which indicates that if Defendant had made prompt objection coupled with the request for instruction by the court to the jury panel not to consider the objectionable remarks, the harm, if any, would have been cured. In other words, we believe the asserted improper remarks of Plaintiff's counsel were curable by prompt objection coupled with request for instruction not to consider the remarks.

■ Our Supreme Court has held many times, wherein jury arguments are concerned, that if the improper jury argument is curable, the complaining party must object to such argument and request the court to instruct the jury not to consider same, and failure to do so waives the error. *Ramirez v. Acker* (1940), 134 Tex. 647, 138 S.W.2d 1054; *King v. Federal Underwriter Exchange* (1946), 144 Tex. 531, 191 S.W.2d 855; *Wade v. Texas Employers' Insurance Assn.* (1951), 150 Tex. 557, 244 S.W.2d 197; *Texas Employers' Ins. Assn. v. Haywood* (1954), 153 Tex. 242, 266 S.W.2d 856; *Turner v. Turner* (Tex.1964), 385 S.W.2d 230, 237; *Otis Elevator Co. v. Wood* (Tex.1968), 436 S.W.2d 324 (excellent discussion by Chief Justice Greenhill on p. 333). Also see *Hartford Acc. & Indemn. Co. v. Thurmond* (Tex.Civ.App. Corpus Christi, 1975), 527 S.W.2d 180, 192, NRE.

■ However, be that as it may, before a judgment is reversed because of argument of counsel, two things must appear: the argument must be improper, and it must be such as to satisfy the reviewing court that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. To resolve this problem we must consider the entire record. Rule 434, T.R.C.P., *Aultman v. Dallas Railway And Terminal Co.* (1953), 152 Tex. 509, 260 S.W.2d 596; *McNeil v. Current* (Tex.Civ.App. Houston, 1972), 484 S.W.2d 394, NRE; *Twin City Fire Insurance Co. v. Gibson* (Tex.Civ.App. Amarillo, 1972), 488 S.W.2d 565, at p. 582, NRE.

■ We have carefully examined the entire record and have determined that the asserted improper voir dire examination by Plaintiff's counsel, if error, was harmless error under Rule 434, T.R.C.P. Moreover,

we cannot say from the record before us that the trial court abused his discretion in his conduct of the voir dire examination.

 Appellant further complains that Plaintiff's counsel in the voir dire examination informed the jury that total and permanent incapacity meant 401 weeks at $35.00 per week, and thereby the jury was informed of the legal effect of their answers. The record shows that Plaintiff's counsel did inform the jury panel of this three different times (on pages 3, 37, and 41) without any objection from opposing counsel. This was pleaded by Plaintiff without any special exception having been levelled against same by Defendant. Such informing of the jury, if error, was waived and in our opinion was harmless, considering the record as a whole. See *Transport Insurance Co. v. Nunn*, (Tex.Civ.App. Houston, 1964), 375 S.W.2d 484, NRE; *Utica Mutual Ins. Co. v. Jacobs* (Tex.Civ.App. Houston 14th CA 1972), 483 S.W.2d 500, no writ. In the record before us, it does not appear that lump sum payment had been stipulated.

 Finally, our Supreme Court has held that the workmen's compensation act should be liberally construed in favor of the workman, since in coming under the terms of the act the workman is denied his common law rights; *Hargrove v. Trinity Universal Ins. Co.* (1953), 152 Tex. 243, 256 S.W.2d 73; and if there is any reasonable doubt which may arise in a particular case as to the right of the injured employee to compensation, same should be solved in favor of such right. *Bailey v. American General Ins. Co.* (1955), 154 Tex. 430, 279 S.W.2d 315, 318.

We have carefully examined all of Appellant's points and contentions and overrule same. Judgment of the trial court is accordingly affirmed.

AFFIRMED.

HALL, Justice (concurring).

I concur in the affirmance.

The voir dire in question was clearly improper. However, I agree that the harm caused by it was curable in this case by timely objections coupled with instructions by the court to the jury to disregard it; and that without a showing of such objections and requests for the instructions by the appellant, and incorrect rulings thereon by the court, the record does not reflect reversible error relating to the voir dire. *Turner v. Turner*, 385 S.W.2d 230, 237 (Tex.Sup., 1965); *Texas Employers' Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856, 858 (1954).

I agree also that the appellant's requested issue is a different phase or shade of submitted issues nos. five, six, and seven. Findings on the appellant's defensive theories of periods of temporary total incapacity intermittently broken by periods of partial incapacity or no incapacity could have been made in answers to these issues and issues nos. eight, nine, and ten if the jury had determined to do so. Accordingly, the court's refusal to submit the requested issue was not error. Rule 279, Vernon's Tex. Rules Civ.Proc.

It is for these reasons only that I join the majority in overruling the appellant's complaints relating to the jury voir dire and the court's charge.