**Soerono HARYANTO, Appellant,**

v.

**Mohammad SAEED, Appellee.**

**No. C14–92–00846–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 5, 1993.

Rehearing Denied Sept. 16, 1993.

James M. McGraw, James M. Whorley, Houston, for appellant.

Jeffery Steidley, D. Craig Olivier, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and MURPHY, ROBERTSON, SEARS, CANNON, DRAUGHN, ELLIS, BOWERS and LEE, JJ.

## OPINION ON MOTION FOR REHEARING EN BANC

J. CURTISS BROWN, Chief Justice.

Mohammad Saeed, appellee, brought suit against Soerono Haryanto, appellant, alleging false imprisonment, negligence, gross negligence, a terroristic threat, assault, reckless conduct, and intentional infliction of emotional distress. The jury found for appellee on all causes of actions and awarded him total damages of $3,000,000.00 including $1,000.000.00 in actual damages and $2,000,-000.00 in punitive damages. The trial court entered judgment on the jury's findings. In five points of error, appellant challenges the voir dire and jury argument of appellee's counsel, the sufficiency of the evidence supporting the jury award, and certain evidentiary rulings by the trial court. We affirm.

Appellee worked as a night auditor for the Marriott Hotel located in the medical center in Houston, Harris County. On February 23, 1990, appellee was asked to deliver some blank credit card vouchers to a room. This room was assigned to an aide of a Saudi Arabian prince. When appellee delivered the vouchers, appellant asked him to enter the room to act as a witness for a business transaction. Appellee recognized appellant as a "V.I.P." or "special" guest of the hotel. Appellee was frightened by him. The night before, appellee had come in contact with appellant who became agitated and "came at him." Earlier that same night, appellee witnessed an incident in which appellant became extremely intoxicated and had to be escorted from the hotel's restaurant. Once appellee entered the room, appellant again became belligerent. He cursed appellee and repeatedly threatened to kill him. Appellant pulled a gun and ordered appellee to kneel down in front of him and to kiss his feet. Appellant told appellee that he would be "no more than a servant" in his country. Appellant called to the front desk and demanded $1,000,000.00 to spare appellee's life. Finally, hotel management and security were able to secure the release of appellee after approximately thirty-five minutes to an hour of this treatment. Appellant did not leave the hotel quietly. As he was being escorted to the hotel lobby, appellant went into a fighting stance and began to threaten a hotel security guard. The police were called, but before they arrived, appellant left the premises.

Appellee began to suffer physical problems from this experience. He was diagnosed as suffering from post-traumatic stress disorder. He continued to work at the Marriott but quit when he felt hotel management began to treat him differently. Appellee felt the hotel's concern was in placating appellant, a V.I.P. guest, and not in rectifying the wrong that had occurred. Appellee was unable to find employment so he left the country and went back to his family in Pakistan. During the four months that appellee was out of the country, he continued to see a doctor. When he returned, appellee was able to secure employment as a night auditor at another hotel chain. Appellee continues to have difficulty sleeping and is in fear of his life.

Appellee filed suit against appellant and his father four months after the incident occurred. Appellee later nonsuited appellant's father. Appellant completely ignored the judicial process. He did not engage in any pre-trial discovery and did not appear at trial even though counsel for both parties had agreed to the trial setting. Trial was in March 1992, and lasted three days. During trial, appellant's counsel cross-examined appellee's witnesses, but because he did not designate witnesses, he could not present a case-in-chief.

In the first point of error, appellant contends that the trial court committed reversible error by allowing certain statements made by appellee's counsel during voir dire and closing argument. Because the standards of review for determining error in voir

dire and closing argument are different, we analyze each separately.

### Voir Dire

■ During voir dire, counsel for appellee made light of appellant's absence from the trial and the fact that appellant and his family were wealthy foreign nationals. He also commented on the fact that appellant wielded a gun during the incident in question and that appellant's conduct, while criminal in nature, was subject to civil damages. Counsel further instructed jurors on the purpose of punitive damages and suggested that such damages were permissible to send a message to appellant and other visitors to this country that such conduct would not be tolerated. Appellant's counsel made a single attempt at an objection during voir dire:

\* \* \* \* \* \*

One of the things that happens to be true at least in some circumstances in the United States, is that if you have money, you can do things easily. Some things you can do instead that people that don't have money can't do. That's the way things are. If you have the money, you can drive a better car. If you don't then you don't drive a better car. Does anybody feel like that the fact that someone has comparable wealth at their disposal—

Mr. Jefferson: Your Honor, I'm going to object to the grounds that—

Mr. Pearce: That we are having a trial by wealth instead of trial by facts.

The Court: What rule of evidence?

Mr. Pearce: I don't have a rule of evidence.

The Court: Then your objection is overruled. Please limit your argument to proper voir dire.

Appellant did not object to any other statements and questions by appellee's counsel and thus, failed to preserve error. *See Babcock v. Northwest Memorial Hosp.*, 767 S.W.2d 705, 707–08 (Tex.1989) (opinion on motion for rehearing) (plaintiffs in medical malpractice action preserved error in voir dire by timely objections); TEX.R.APP.P. 52(a). Even if the grounds for appellant's complaint do not require an objection be-

cause they are apparent from the record, we find that appellant's complaint is without merit. *See Babcock*, 767 S.W.2d at 708.

■ The right to a fair and impartial trial is guaranteed by the Constitution and by statute. See TEX.CONST. art. I, § 15; TEX. GOV'T CODE ANN. § 62.105 (Vernon Supp. 1993). Counsel is permitted broad latitude on voir dire. *Texas Employers Ins. Assoc. v. Loesch*, 538 S.W.2d 435, 440 (Tex.Civ.App.—Waco 1976 writ ref'd n.r.e.). Voir dire examination is a matter within the sound discretion of the trial judge and his or her judgment will not be reversed absent a clear abuse of discretion. *Babcock*, 767 S.W.2d at 709 (*citing Loesch*, 538 S.W.2d at 440). A court abuses its discretion when its denial of the right to ask a proper question prevents determination of whether grounds exist to challenge for cause or denies intelligent use of peremptory challenges. *Id.* (*citing Dickson v. Burlington N.R.R.*, 730 S.W.2d 82, 85 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.)). The purpose of many of counsel's statements and questions was to ascertain whether prospective jurors had any connection or relationship with appellant or his family as well as whether jurors were biased or prejudiced in favor of, or against appellant because of his nationality, wealth, and status. Those matters are clearly within the scope of proper voir dire examination. *See* TEX.GOV'T CODE ANN. § 62.105; *Gonzales v. Texas Employers Insurance Association*, 419 S.W.2d 203, 209 (Tex.Civ.App.—Austin 1967, no writ). In addition, we find that other statements and questions by counsel touching upon appellant's absence from trial, the criminal versus civil nature of appellant's conduct, and prospective jurors' attitudes toward the purpose of punitive damages are all proper subjects of voir dire examination.

■ Appellant also accuses appellee's counsel of falsely declaring that appellant was arrested and a fugitive from justice. The record reflects that appellant was not charged with a crime but was merely detained and released. Although counsel did state that "the evidence will be" that appellant was "arrested" and "taken downtown," the trial judge cured any harm when he

interjected immediately thereafter to instruct the jury that what the attorneys say during voir dire is not evidence.

This is simply not a case where on voir dire one party was prohibited from delving into a topic explored by the other party. Counsel for appellant had an equal opportunity to question prospective jurors about the subject matter touched upon by appellee's counsel and more importantly, to inquire into the effect of comments by appellee's counsel. Appellant's counsel made the following inquiry:

\* \* \* \* \* \*

Do any of you feel that the comments that have been made by Mr. Steidley, or Steidley, having to do with his allegations and his statement that there was a gun, that Mr. Saeed was held for hours, and these people are Philippino [sic] and we need to send a message to the Philippines and do any of you know Imelda Marcos, would you be surprised to find that Mr. Haryanto is not Philippino [sic], but is Indonesian? And would you be surprised that he has no association or knowledge of Imelda Marcos?

The fact that these comments have been made by Mr. Steidley as a preclude [sic] to the presentation of what the real facts are in this case, has any of that prejudiced any of you to the extent that you can't sit here and listen to the evidence from both sides in this case and make a just and fair decision based on the evidences [sic] presented from the stand and presented in this courtroom, and not what Mr. Steidley says? Do any of you have a problem with that?

Clearly, appellant's counsel was not deterred from remedying any prejudice that might have occurred as a result of the remarks made by appellee's counsel during voir dire. Thus, even if he had preserved error, appellant failed to show any harm. Accordingly, we find that appellant was not deprived of a fair and impartial jury.

### Closing Jury Argument

Counsel's theory of the case was that the attack was motivated not only by appellant's belief that he could do as he pleased because of his status as a wealthy foreign national and V.I.P. guest but also by his prejudice toward appellee. Counsel also sought to emphasize appellant's disdain for this country's legal system. As we read his argument, counsel attempted to make the following points to the jury: (1) that they should render a verdict that holds appellant accountable for his conduct and does not allow him to escape justice by virtue of his wealth and status as a foreign national; (2) that they should render a verdict that upholds the values of equality that America represents; (3) that they should render a verdict that sends a message to the absent appellant and other visitors to America that they cannot ignore our judicial system or impose their own country's laws or values upon our citizens but must abide by our laws; and (4) that a stringent civil, as opposed to a criminal penalty, will have more of an effect on appellant. These points have their genesis in the record, as "nationality, wealth, and status" of the parties were more than mere incidental facts of this case.

To obtain reversal of a judgment on the basis of an improper jury argument, an appellant must prove: (1) error; (2) that was not invited or provoked; (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial; (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge. *Standard Fire Insurance Company v. Reese*, 584 S.W.2d 835, 839 (Tex.1979). There are only rare instances of incurable harm from improper argument. *Id.* In those cases, appellant must show that the argument by its nature, degree, and extent constituted reversibly harmful error. *Id.* That is, "the probability that the improper argument caused harm" must be greater than "the probability that the verdict was based upon proper proceedings and evidence." *Id.* In making that determination, an appellate court must examine the improper jury argument in light of the whole case, beginning with voir dire and ending with closing argument. *Id.* The court must look at the length of the argument, whether it was re-

peated or abandoned, whether there was cumulative error, and the probable effect of the argument on a material finding. *Id.*

■ Although he did not object to the complained of argument, appellant asserts that none was required because the argument was both improper and incurable. Appellant asserts that counsel's argument was nothing more than an appeal to prejudice based on race, ethnicity, and nationality. In support of his position, appellant cites cases which hold that argument appealing to race, ethnicity or nationality is incurable. *See Texas Employers' Ins. Ass'n v. Hayward,* 153 Tex. 242, 266 S.W.2d 856 (1954), *Texas Employers' Ins. Ass'n v. Guerrero,* 800 S.W.2d 859 (Tex.App.—San Antonio 1990, writ denied); *Texas Employers' Ins. Ass'n v. Jones,* 361 S.W.2d 725 (Tex.Civ.App.—Austin 1962, writ ref'd n.r.e.), *Basanez v. Union Bus Lines,* 132 S.W.2d 432 (Tex.App.—San Antonio 1939, no writ). However, in those cases the issues of race, ethnicity or nationality were *injected into the case* solely by counsel's argument. *See Carson v. Amberton,* 148 S.W.2d 972, 975 (Tex.App.—San Antonio 1941, writ dism'd judgm. cor.) (emphasis added). None of those cases involved a situation where, as here, race, ethnicity or nationality existed by reason of the evidence necessarily relied upon by a party to establish his or her pleaded cause of action. *See id.* (in suit by administrator of Greek descent on behalf of deceased of Greek descent, opposing counsel's references in closing argument to the veracity of his witnesses, also of Greek descent, held proper).

Here, appellee pled causes of action for false imprisonment, intentional infliction of emotional distress, and a "terroristic threat." Appellant was an Indonesian national. His family was engaged in the international oil business and was wealthy. Because appellant's father was being treated for an illness in the medical center, appellant and his family were frequent, long-term guests of the hotel. Appellee was a resident alien from Pakistan. He jumped ship several years earlier in an attempt to gain U.S. citizenship. Appellant's counsel called attention to that fact during his own closing argument in an attempt to question appellee's veracity.

During the first couple of years, appellee stayed with a friend of his father but was eventually "turned out into the streets" when the friend "lost" the $4,200.00 in savings that appellee gave him. Appellee worked for years in low, hourly-wage jobs. Before the incident in question, appellant had been involved in "run-ins" with hotel staff, including appellee. During the incident, appellant detained appellee against his will and made threats and derogatory remarks to appellee based on appellee's nationality and religion. As we described, appellant told appellee that he would be "no more than a servant" in his country. By forcing appellee at gunpoint to kneel before him, appellant's conduct was particularly abhorrent to appellee because it was in direct contravention of his Islamic beliefs. Appellee, while not ordinarily prejudiced, became fearful and suspicious of Oriental people as a result of the incident. After appellee filed this lawsuit, appellant made his whereabouts unknown and ignored the judicial process. Appellant's disdain for the legal system and the reality of the cultural and economic differences between the parties were raised by the evidence and cannot be ignored simply because it might be distasteful.

Here, the parties were of different nationalities and that difference was a motivating factor for appellant's attack. None of the jurors was of the same nationality of the parties and counsel did not seek to align jurors with appellee or against appellant simply on the basis of race, ethnicity or nationality. Rather, the appeal to unity in the instant case was for all "citizens," to stand *against prejudice* and disrespect of the legal system by any person, whatever their race, nationality or wealth. Based upon the particular facts of this case, we are not prepared to say that such an appeal was *per se* improper. Therefore, any alleged error during argument was not preserved by a proper objection. *See Reese,* 584 S.W.2d at 840–41.

■ Appellant also contends that counsel's argument improperly cast him as a fugitive from criminal justice and inappropriately asked the jury to consider wealth in assessing actual damages. In support of the for-

mer contention, appellant refers to the following remark:

He was very close, I submit to pulling that trigger. If Mr. Tanguay hadn't been there, I submit to you that he would have, and then been on a plane to Singapore. "The D.A. can't get me here and I don't know that because the courthouse is across the street, that Mr. Haryanto didn't want to be around here."

 The trial court properly sustained an objection to this remark by appellant's counsel because it was outside the record. Argument outside the record is ordinarily curable by a timely objection and prompt instruction to disregard. *See id.,* 584 S.W.2d at 840–41. Although appellant's counsel subsequently failed to request an instruction, argument along the lines complained of was discontinued. Thus, any error was cured. In support of the latter contention, appellant refers to the following remark:

... the only way you are going to be able to raise this man's consciousness to teach him a lesson and punish him and deter him is to write down numbers in the actual damages and punitive damages in the blanks of these charges, is large numbers. And when I say large numbers, I mean large numbers to Mr. Soerono Haryanto. Put down half a million dollars on the actual damages' blank. I'm not sure he will even bat an eye. He may.

References to a defendant's financial ability is a proper subject of argument because it is relevant evidence and may be considered by the jury in its determination of the amount of *punitive* damages to be awarded. *See Lunsford v. Morris,* 746 S.W.2d 471, 473 (Tex.1988); *see also Transmission Exchange Inc. v. Long,* 821 S.W.2d 265, 273 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (emphasis added). While appellee's counsel alluded to appellant's wealth at varying points in his argument, he never specifically requested the jury to award actual damages on that basis. Even if counsel's remarks were error, it was waived because the objection at trial was only that counsel was suggesting a specific amount. An objection at trial which is not the same as the objection

urged on appeal presents nothing for review. *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 655 (Tex.App.—Corpus Christi 1991, writ denied). Because we find that error was not preserved in either voir dire or jury argument, we overrule appellant's first point of error.

In his second point of error, appellant contends that the jury's award of actual damages was not supported by sufficient evidence and excessive. Appellant requests a remittitur in the prayer for relief of his brief.

 In determining whether damages are excessive, the standard of review is the same as for any factual insufficiency question. *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986). That is, we must examine all the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient, or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Exxon Corp. v. Shuttlesworth,* 800 S.W.2d 902, 905 (Tex. App.—Houston [14th Dist.] 1990, no writ) (citing *Pope,* 711 S.W.2d at 624). Question no. 8 was submitted in broad form. *See* 1 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 7.02 (1991). The jury was first asked to determine what "sum of money" would "fairly and reasonably" compensate appellant for his injuries in the past and future. The jury was next instructed to consider the following elements of damages: (a) physical pain and mental anguish; (b) loss of earning capacity; (c) physical impairment; and (d) medical care. The jury was then asked to award a lump sum for both past and future damages. The jury awarded past damages of $500,000.00 and future damages of $500,000.00.

When a damages issue is submitted in broad form, an appellate court cannot ascertain with certainty what amount of the damages award is attributable to each element. *Greater Houston Transp. v. Zrubeck,* 850 S.W.2d 579, 589 (Tex.App.—Corpus Christi 1993, writ pending); *see also Johnson v. King,* 821 S.W.2d 425, 429 (Tex.App.—Fort Worth 1991, writ denied). "Furthermore, when the elements of actual damages consid-

ered by the jury include the more amorphorous, discretionary damages, e.g., mental anguish, pain and suffering, physical impairment, and disfigurement, any amount awarded above the more definite damages such as past medical expenses and lost wages will be shunted to the jury." *Id.* "Thus, under the current practice, a meaningful review on appeal of damages questions in broad form is extremely difficult." *Id.*

█ In *Greater Houston Transp.,* the damage issue was submitted in broad form and the jury awarded $175,000.00 for past damages and $25,000.00 for future damages. *Greater Houston Transp.,* 850 S.W.2d at 588 n. 9. On appeal, the defendant complained of the sufficiency of the evidence to support certain elements of damages but failed to address all elements. 850 S.W.2d at 588. The court stated that "the only way that a defendant can successfully attack a multi-element damages award on appeal is to address each and every element and show that not a single element is supported by sufficient evidence." 850 S.W.2d at 589. The court explained that "if there is just one element that is supported by the evidence, the damages award will be affirmed if it is supported by the evidence." *Id.* The court held that the defendant "waived any complaint about the sufficiency of the evidence regarding actual damages by failing to request findings on each element of damages, and by failing to address all of the elements of damages in its argument." *Id.* Likewise, in the instant case appellant failed to request findings on each element of damages or address all elements of damages in its argument and, therefore, failed to preserve error. *See id.* However, even if we were to review the "aggregate evidence," we would conclude that it supports the award of actual damages. *See id.*

While the record was not fully developed, there is no question that appellee suffered ·damages as a direct result of severe emotional distress inflicted upon him by appellant's extreme and outrageous conduct. *See Wornick Co. v. Casas,* 856 S.W.2d 732 (Tex.1993); *see also Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993). Appellee testified that: (1) he was very scared during the entire incident and even began his "last prayers" because he "knew" appellant was going to kill him; (2) he was still scared when he saw appellant being escorted by security and later, when he filled out the incident report; (3) he became frightened when his boss suggested several days later that he meet appellant and his wife for dinner and became so nervous and frightened when his boss failed to show up for the meeting, that he asked the bartender to call security; and (4) his girlfriend broke off their relationship because of his panic and nervousness. Appellee's testimony regarding his fear and anxiety was supported by the testimony of his immediate supervisor, Margaret Heilers–Turpin, and coworker, John McKechnie. It was also supported by the medical records and the testimony of psychiatrist, Dr. Donald L. Thomasson.

Immediately after the incident, appellee suffered from chest pains and visited a heart specialist at MacGregor Medical Association, who then referred him to Dr. Thomasson. Exhibit No. 3 is a $323.00 bill from MacGregor. Appellee saw Dr. Thomasson three to four times. Dr. Thomasson testified that he first saw appellee on March 1, 1990. Appellee had been suffering from chest pains, was unable to sleep, and had stomach pains since the incident. Before the incident, appellee's history was unremarkable. Dr. Thomasson found that appellee was suffering from post-traumatic stress syndrome and prescribed an anti-depressant. Appellee also made several visits to a psychiatrist in Pakistan when he was there visiting his family. The incident caused appellee to suffer from heart palpitations, sleeplessness, and vomiting. Appellee also developed an ulcer for which he is still taking medication. Appellee is addicted to over-the-counter sleeping pills and has quit playing tennis and jogging due to his "physical condition." Appellee was forced to quit his job over this incident three months later because of the treatment he received from his supervisors. When he left his job, he could not immediately find work and could not afford a doctor's care. Appellee missed six months of work as a result of the incident. Ms. Heilers–Turpin testified that appellee made $6.00–$7.00 per hour.

Appellee continues to have sleeping problems. He is still shaken by the incident and continues to live in fear of his life. Although appellee's last visit was some twenty-two months before trial, Dr. Thomasson testified that appellee would require three years of one-on-one counseling, once a week at $150.00/hr. and three years of group counseling, once a week at $75.00/hr. He also stated that appellee's problems would continue in the future if left untreated. In a case involving egregious facts such as this one, where appellee has alleged, among other causes of action, false imprisonment, intentional infliction of emotional distress, and a "terroristic threat," intangible or discretionary damages such as pain and mental anguish are going to constitute the majority of the injury. To recover damages for mental anguish, a plaintiff must prove more than mere worry, anxiety, vexation, embarrassment or anger. *See Town East Ford Sales, Inc. v. Gray,* 730 S.W.2d 796, 803 (Tex.App.—Dallas 1987, no writ) (opinion on motion for rehearing). Translating those damages into dollars is necessarily an arbitrary process. *See Skaggs Alpha Beta, Inc. v. Nabhan,* 808 S.W.2d 198, 202 (Tex.App.—El Paso 1991, writ pending). In the absence of any objective guidelines, we must ordinarily defer to the jury's discretion in determining damages for pain and mental anguish. *See LaCoure v. LaCoure,* 820 S.W.2d 228, 234 (Tex.App.—El Paso 1991, writ denied). Based on the record before us, we cannot say the evidence is so against the great weight and preponderance of evidence as to be manifestly unjust. Because we find that jury's award of actual damages is supported by the evidence, we overrule appellant's second point of error.

In his third point of error, appellant contends that the jury's award of punitive damages is not supported by sufficient evidence and excessive.

Question no. 9 asked the jury to award exemplary damages. The jury was instructed that "exemplary damages" meant "an amount that you may in your discretion award as example to others and as a penalty or by way of punishment, in addition to any amount you may have found as actual damages." Appellant does not specifically attack the evidence supporting the jury's finding of gross negligence in question no. 2, but asserts only that the punitive damages are not rationally related to the actual damages. *See Wright v. Gifford Hill & Co.,* 725 S.W.2d 712, 714 (Tex.1987). An award of punitive damages rests upon the jury's discretion and will not be set aside unless the amount is so large as to indicate that it is the result of passion and prejudice, or that the evidence was disregarded. *Aetna Casualty and Sur. Co. v. Joseph,* 769 S.W.2d 603, 607 (Tex.App.—Dallas 1989, no writ). To determine whether an award of exemplary damages is reasonable, we must consider the following factors:

(1) the nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer;

(4) the situation and sensibilities of the party concerned;

(5) the extent to which conduct offends a public sense of justice and propriety;

(6) the frequency of the wrongs committed; and

(7) the size of the award needed to deter similar wrongs in the future.

*Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981); *State Farm Mutual Ins. v. Zubiate,* 808 S.W.2d 590, 599 (Tex.App.—El Paso 1991, writ denied).

The extreme and outrageous nature of appellant's conduct is *uncontroverted. See Wornick Co.,* 856 S.W.2d at 733; *See also Twyman,* 855 S.W.2d at 620–22. In addition, the ratio of actual to punitive damages is only 2 to 1 and well within the statutory cap. Tex.Civ.Prac. & Rem.Code Ann. § 41.007 (Vernon Supp.1993). We have thoroughly reviewed the record in light of the above factors and find that the jury's award of punitive damages was reasonable. We overrule appellant's third point of error.

In his fourth and fifth points of error, appellant contends the trial court erred in admitting billing records from the Marriott Hotel (Exhibit No. 2) and the testimony of appellee's expert, Dr. Thomasson.

Appellant asserts that the Marriott Hotel bills were incurred by appellant's family during their stay in late 1989, and were not relevant to any issue in the case. Some of the documents included in Exhibit No. 2 appear to reflect several previous stays at the Marriott by appellant's family and show numerous charges that were not incurred by appellant himself. To reverse the trial court's judgment based upon error in the admission or exclusion of evidence, appellant must show that the trial court in fact committed error and that, based upon the entire record, the error was reasonably calculated to cause and did cause rendition of an improper judgment. *Gee v. Liberty Fire Mutual Ins. Co.,* 765 S.W.2d 394, 396 (Tex. 1989). There is ordinarily no reversible error for erroneous rulings on the admissibility of evidence where the evidence in question is cumulative and not controlling on a material issue dispositive of the case. *Id.*

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R.CIV.EVID. 401. In an attempt to explain some of his actions after the incident, appellee sought to establish at trial that the hotel showed favoritism toward appellant and pressured him (appellee) into those acts. Specifically, appellee contended that he was pressured to omit facts from an incident report, including the fact that appellant possessed a weapon, prompted to meet with appellant and his wife shortly after the incident, and ultimately forced to resign his job all because the hotel wanted to insulate appellant and his family from any negative ramifications of the incident. Exhibit No. 2, while not by itself material to the outcome of the case, was relevant and admissible because it helped demonstrate the hotel's motive for pressuring appellee by showing that appellant and his family were regular guests of the hotel and provided substantial revenue. Moreover, the charges incurred by appellant's family as represented in Exhibit No. 2 and the fact that appellant and his family were frequent hotel guests were subjects repeatedly mentioned throughout the trial without objection by appellant's counsel.

Thus, any error in admitting Exhibit No. 2 was harmless because it was cumulative of other similar evidence in the record. *See id.; see also Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984).

Appellant also contends that Dr. Thomasson should not have been allowed to testify because he was not properly designated as an expert thirty days before trial as required by the discovery rules. *See* TEX. R.CIV.P. 166b(6)(b) In August 1991, pursuant to the court's docket control order, appellee designated a "Dr. Donald L. Thompson, 6575 West Loop South, Houston, Texas, 660–9944." As we described earlier, Dr. Donald L. Thomasson treated appellee for his psychological problems at the Hauser Clinic. As best we can discern from his trial objection, appellant's counsel explained that he was furnished with Dr. Thomasson's reports from the Hauser Clinic but, based on appellant's designation, was expecting trial testimony by a "Dr. Thompson" from another health care facility. The court overruled appellant's objection finding that appellee established good cause for admitting Dr. Thomasson's testimony. The court stated that the telephone number and address were properly identified and that the name, while incorrect, was the result of a typographical error. The court noted that "any amount of inquiry would have located the proper name of the witness."

Failure of a party to supplement discovery results in the automatic exclusion of testimony of an unidentified witness. *See Gee,* 765 S.W.2d at 395 (citing *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 298 (Tex.1986)); TEX.R.CIV.P. 215(5). The testimony of an unidentified witness is admissible if the trial court finds that good cause exists for allowing the witness to testify. *Gee,* 765 S.W.2d at 395 (citing *Yeldell v. Holiday Hills Retirement & Nursing Ctr., Inc.,* 701 S.W.2d 243, 246 (Tex.1985)). It is within the trial court's discretion to determine whether good cause exists. *Gee,* 765 S.W.2d at 396.

We are not convinced that this is a case of an "unidentified witness." Clearly, appellee's counsel knew at the time of trial that Dr. Thomasson had treated appellee at the Hau-

ser Clinic. The name listed on the designation was substantially correct. It merely replaced an "a" with a "p" and omitted an "s." The telephone number listed on the designation correctly identified the number to the Hauser Clinic. The address listed on the designation, however, incorrectly identified the address for the Hauser Clinic. Although Dr. Thomasson had not practiced at the clinic since December 1990, appellant made no attempt to depose appellee's expert or to conduct discovery of any kind regarding the identity of the expert or the substance of his proposed testimony. Hence, we find no error by the trial court in ruling that good cause existed to admit Dr. Thomasson's testimony.

■ Even if it was error to admit that testimony, such error was harmless because it was merely cumulative of other properly admitted evidence. *See Gee,* 765 S.W.2d at 296. At the time of Dr. Thomasson's testimony, medical records from MacGregor and the Hauser Clinic were before the jury. Those records detailed appellee's symptoms. The clinic records specifically included the diagnosis of post-traumatic stress disorder. The jury also heard testimony regarding appellee's symptoms from appellee, Ms. Heilers–Turpin, and Mr. McKechnie. Thus, even without Dr. Thomasson's testimony there was evidence that substantiated appellee's damages claim. Accordingly, we overrule appellant's fourth and fifth points of error and affirm the judgment of the trial court.

CANNON, Justice, concurring.

I agree with the majority that the argument of appellee's counsel was properly within the evidence of this case, however, I would affirm the trial court's judgment only if appellee files a remittitur of certain actual damages.

Broad form submission is now mandated by our Supreme Court "in any or every instance in which it is capable of being accomplished." *See Texas Dept. Of Human Services v. E.B.,* 802 S.W.2d 647, 649 (Tex. 1990) (opinion of motion for rehearing) (citing Tex.R.Civ.P. 277). However, I do not believe the Supreme Court, by mandating broad form submission, intended to preclude appellate review of jury awards or to bar remittiturs where the jury has plainly abused its discretion. *See Greater Houston Transp. v. Zrubeck,* 850 S.W.2d 579, 588 (Tex.App.— Corpus Christi 1993, writ pending). As the dissent notes, a generous reading of appellee's proof shows actual, nondiscretionary damages, both past and future, of $42,647.00. That means, the remaining discretionary damages, both past and future, amounted to a staggering $957,303.00. Giving deference to the jury's discretion, appellee's uncontroverted testimony about the bizarre facts surrounding the incident and the resulting anxiety and loss of his job, along with Dr. Thomasson's testimony that appellee suffered from post-traumatic stress disorder, support the jury's award of $500,000.00 for past damages.

However, I cannot give the same deference to the jury's award of $500,000.00 for future damages. Appellee's testimony that he suffers from an ulcer, continues to have sleeping problems, and is addicted to over-the-counter sleeping pills more than two years after the incident is not supported by any independent medical evidence. Dr. Thomasson, who had not seen appellee in almost two years, testified hypothetically that if appellee were still suffering symptoms of anxiety, he would require a certain amount of group and individual psychotherapy. I would hold that the jury's award for future damages which was based solely on the testimony of appellee and a doctor who had not seen him two years is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986). Therefore, I would reverse the judgment and remand to the trial court unless appellee filed a remittitur of future damages in the amount of $400,000.00 within thirty days of the date of this opinion. If appellee accepted the remittitur, remand would not be necessary and I would affirm the trial court's judgment. See Tex.R.App.P. 85(c); *see also Larson v. Cactus Utility Co.,* 730 S.W.2d 640, 641 (Tex.1987).

ROBERTSON, Justice, dissenting.

The majority concludes that the closing argument of appellee's counsel was proper and even if it was not, that appellant did not

properly preserve error. I respectfully dissent.

Conspicuously absent from the majority opinion is any detail of the complained-of argument of appellee's counsel. It is possible that if the argument was set forth, the majority would be hard pressed to find it not reversible error. It is, of course easier to address the argument in the abstract. It is also possible that there is the hidden fear that it could be used as judicial precedent for the following scenario:

A Caucasian man worked at a hotel. On several nights, he observed a wealthy African–American male abuse and belittle the staff. One night he was asked to deliver something to one of the rooms. It so happened that this African–American male was visiting that room. When the hotel employee made the delivery, the African–American male invited him inside. Once he entered, the African–American male began to verbally abuse him. He cursed the employee, he repeatedly threatened to kill him. He told the employee to kneel down and kiss his feet. He brandished a gun. He told the employee that in the Fifth Ward, he would be no more than a target for shooting practice. He finally called down to the front desk and demanded $1,000,000 to spare the employee's life.

The hotel manager came to the room and the employee was able to leave. He worked that night but quit after management began to treat him differently. He suffered post-traumatic stress syndrome. He decided to sue the African–American male. The African–American male answered the suit but did nothing else. He did not participate in discovery. He did not appear at trial, even though counsel for both parties had agreed to the trial setting.

During voir dire, the employee's counsel began by describing the defendant as a gun-wielding black man from the Fifth Ward. He asked the venire if anyone knew several blacks from the Fifth Ward who were currently in the news for terrible crimes they committed. He implied that the defendant had been arrested the night of the incident even though he knew he had not.

During trial, all of the facts were put before the jury. The employee related every statement said to him by the defendant. The defendant did not present his own witness because he failed to designate any. The employee's counsel made the following closing argument:

Defendant has abused you the jury. He has abused the very foundation and basis of this country and you must hold him accountable. In some places blacks think they should be treated like Gods. They can do anything they want. The defendant thinks he is that type of person and that he can come to our side of town and do whatever he wants. He is wrong and you need to send him a message that he is wrong. All of you are respectable citizens. You know what America stands for and you know that we cannot allow someone from the Fifth Ward go wherever he wants and say, "When I'm here slavery is fine; and if I say kiss my feet and if I say I will kill you, if I want to terrorize you, that is okay because that is how I would treat you where I am from." That is wrong and we must tell him that.

The defendant has not even come here to defend himself. He has not even tried to do the right thing and admit he did it, his counsel refuses even today, I suppose on instructions from the Fifth Ward. He is thumbing his nose at you, at this process. You have the opportunity to do something about it. You need to send a message to the defendant in the Fifth Ward or wherever he is hiding out and tell him that in our part of the city you don't act like that.

I suggest that what ever you award in actual damages, you need to double it, triple it, quadruple it, whatever you feel is going to wake him up so that the next time he leaves the Fifth Ward and comes to other parts of this city, he will think twice before he terrorizes someone.

You have the opportunity in your sole discretion to decide what message you want to send to the Fifth Ward and other such communities. You have the opportunity to do something right for our community. Do something to show that some of us are good and some of us are bad. You must

send a message long distance because he didn't even bother to come and defend himself. You are going to have to send it to the Fifth Ward or wherever he is hiding out.

I am sure the majority would be quick to argue that the above example is not analogous at all to the case at hand. Why? Because it would have a very hard time justifying such ethnic references. But even so, that is what they have done in their majority opinion.

Appellant's trial counsel failed to object to the outrageous argument given by counsel for appellee. However, the majority chooses to ignore not only our rules of procedure but also the very case they so heavily rely on to support this egregious argument. Appellant contends the argument was incurable and violated the tenets of proper argument established by the supreme court in *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979). Incurable argument does not require the predicate of an objection. *See* TEX. R.CIV.P. 324(b)(5); *e.g. Texas Employers' Ins. Ass'n v. Guerrero,* 800 S.W.2d 859, 863 (Tex.App.—San Antonio 1990, writ denied). If the argument of appellee's counsel was improper, and if it was incurable, then appellant properly preserved error in his motion for new trial.

Appellee's counsel had an overriding theme throughout his closing argument. He did discuss the mental and physical stress suffered by appellee, but more important to his argument was his focus on the nationality of appellant. Starting on the first page of his closing argument, and lasting throughout, he continually alluded to an "us" versus "them" argument:

\* \* \* \* \* \*

He has abused you[1] in this process. He has abused the very foundation and basis of what this country stands for and he should be held accountable for that and that is what we are asking you to do. In some places the very rich are almost like God. They can do anything they want. Mr. Soerono Haryanto thinks he is that kind of person, and he thinks America is that kind of place. He is wrong about that. He is dead wrong about that, and you should send a message to him to let him know that he is wrong about that.

\* \* \* \* \* \*

In this case, you have a rare opportunity. You have the opportunity to emphasize what America stands for in many, many ways, responsibility for your conduct, of course; but even more deeply engrained (sic) in that is this country was founded on the idea that people from all over the world would be here someday.

All of us, if we go back far enough, come from someplace else. America is described as the great melting pot and that is what it is and that's what you know of the things that makes this country so strong and great, that a diverse group of people can come together and live in a free land. And is it a place where we should not allow someone from Singapore or Indonesia or the Philippines, or whatever this man is, to come over here and say, "When I'm here, slavery[2] is fine; and if I say to kiss my feet and if I say I will kill you, if I have the right to terrorize you for a period of time, it's fine for who I am"? (sic) That is wrong, and we must tell him that.

This Court has even told us that it's a very historical court. You are now a participant of that history, and you should put your stamp in that history with the verdict in this case.

\* \* \* \* \* \*

Stand up and admit that you did it and try to do the right thing, but they refuse even today, I suppose on long distance instructions from Singapore.

\* \* \* \* \* \*

He is thumbing his nose at you, at this process, at this country. And you have the opportunity to do something about it, and you need to take that opportunity in your hands. You need to take the bit between your teeth. You need to send a message

---

1. The "you" referred to by counsel is the jury.

2. Appellee testified that appellant said "servant" *not* "slave."

not just to Soerono Haryanto in the Philippines or Singapore or wherever he is hiding out, but to send a message all the way around that in America you can't do this, that we refuse to allow you to do this.

\* \* \* \* \* \*

And the way that the criminal justice system is set up here, after the police get them, prosecute them, courts lock them up, they are back in Singapore before you know it. So, it may not be all bad that we can't give him three to five years punishment for the acts he's engaged in. But we can send him a message in the only thing that makes a difference to him, and that's his pocket book.

I suggest to you that whatever you award in actual damages, you need to double it, triple it, quadruple it, whatever you feel is going to wake him up and say, sir, tell you what, next time you come to the United States and you get the inkling in your mind that you are going to get yourself drunk, grab one of our citizens, put him in your room and terrorize him for an hour and to demand ransom for them, as you are picking out your pistol or thinking of taking that life into your hands, maybe you will remember that check you had to write. Maybe you will not do it. Maybe you will just not come here, which will suit me just fine.

\* \* \* \* \* \*

You have the opportunity in your sole discretion to decide what sort of message you want to send around the world, across the United States, to the communities around us and to our community.

\* \* \* \* \* \*

"Yes, I am Mr. Soerono's executive assistant. No he can't be here. He is in jail in Singapore or on a plane to Mexico or whatever." Not one single person climbed in this witness chair in the defense of this man.

\* \* \* \* \* \*

He is the kind of man that gives his lawyer instructions. "Go down and do anything you can think of, whether it's based on fact or not, and keep this jury tied up and see if you can get somebody to bite. If you get three, if you can get three, we can try the case some other time when I am in Singapore or wherever."

\* \* \* \* \* \*

You have the opportunity to do something right for this community. Do something right for the United States of America and the basic values that underpen (sic) it's (sic) very existence. You have the right to do something for the ideas that all persons are created equal, all of us. Pakistani goes to Mosque. Whites, black, red, brown, the whole crew of us, we are all equal. Some of us are good and some of us are bad and that's the way life turns out. But as human beings, we start out on an even playing field; and we should. We are guaranteed that right in the United States.

Now, it's not always followed through on and everything is not always fair; but the ideal, the ideal is there and we have held from that ideal and we have worked towards that. And we have somebody come in here, fly in with his entourage and say, "Well, that is fine for you people; but from where I come, people like you kiss my feet. People like you, I can kill you if I want to. I, Soerono Haryanto, I'm telling this jury I can do what I want and there is nothing you can do about it. There is nothing meaningful you can do about it because my lawyers stand up and say they are all lying and I couldn't be there. Sorry. Go back in the jury room and send me a bill for a couple of Ferraris." (sic) That is what he is telling you.

\* \* \* \* \* \*

The fact of the matter is when we get down to the end of the charge and the end of the case, when you are looking at the damages that are assessed in the past, Mr. Haryanto put a value on this man's life of a million dollars to take it away. He has made substantial innuendos that taking things away interest him. He was very close, I submit, to pulling that trigger. If Mr. Tanguay hadn't been there, I submit to you that he would have, and then been on a plane to Singapore. "The DA can't get me here," and I don't know that be-

cause the courthouse is across the street, that Mr. Haryanto didn't want to be around here.

\* \* \* \* \* \*

I don't know the reason he is not here. But the message that you are going to have to send him is going to have to be long distance. You are going to have to send it all the way across the Pacific Ocean to the Philippines or to Singapore or wherever he is, and the only way you are going be able to raise this man's consciousness to teach him a lesson and punish him and deter him is to write down numbers in the actual damages and punitive damages in the blanks of these charges, is large numbers. And when I say large numbers, I mean large numbers to Mr. Soerono Haryanto. Put down half a million dollars on the actual damages' blank. I'm not sure he will even bat an eye. He may.

The majority narrowly focuses on the section of *Reese* that says that most improper jury argument can be cured by an objection and instruction to disregard, but ignores its statement that appeals to racial prejudice are one of the exceptional kinds of argument that are considered incurable. *Reese,* 584 S.W.2d at 840. An appeal for ethnic solidarity is no different. *Guerrero,* 800 S.W.2d at 862. Nor do I find that an appeal to national origin should be treated any differently. Throughout his closing argument, appellee's counsel asked the jury to protect our American values and punish this interloper from abroad.

This argument was similar to that disapproved of in *Guerrero.* That court did not find an outright plea for ethnic solidarity, but instead found "veiled and subtle ethnic references" that could not be affirmed. *Guerrero,* 800 S.W.2d at 864–66. A statement is objectionable whether its inappropriate plea is indirect, implied or direct and express. *Id.* at 864–65. We cannot permit counsel to employ a sophisticated, patriotic plea for national solidarity, while we condemn those who are open with their argument. We would be asked "to label some arguments permissible and uphold them with a wink when everyone knew that [a national] appeal had been made." *Id.* at 865.

I cannot help but agree with the reasoning and analysis of the court in *Guerrero:*

[The supreme] court condemned such appeals to prejudice as "exceptional" and as "an affront to the court and the equality which it must portray." Such arguments, the court said, "will be dealt with harshly." (citations omitted). We think there are compelling reasons for *Reese*'s harsh, incurable-error approach. When a racial or ethnic appeal is made, the dispute is no longer confined to the litigants; there has been an attack on the social glue that helps bind society together. *Reese* characterized it as an affront *to the court.* The offense is against society, and it makes no difference whether the victimized-litigant has shown harm. Lawyers have no right to undermine the ethnic harmony of society simply to win a lawsuit.

*Id.* (emphasis in original). Here appellee's argument was based on an affront to American society. It was no longer the terrible harm suffered by appellee but an attack on everything good and right about America.

Appellee and the majority argue that this argument was only based on the facts and evidence adduced at trial. True, appellant was not a national of this country. True, he told appellee that he would be a servant in his country. But these truths do not allow appellee to make a plea to punish appellant just because he is a foreigner. If this were so, then any defendant that was not a member of the community could be attacked for that difference. If this were true, then as in the example above, counsel could use a implied racial attack because the defendant was an African–American and talked about it during the attack. Surely the majority would not seriously argue that appellee could ask the jury to show those African–Americans that we do not behave in such a manner in our neighborhood.

Appellee's counsel states that he was not pursuing a racial, ethnic or nationalistic theme because his client was also an immigrant. However his client's immigrant status was presented in the context of this country as a great melting pot, where all of us can trace our history back to immigrants who came to this country for our great ideals of equality. He argues that this entire line

of argument shows that he felt all people are created equal, and should be treated fairly and the same. But this argument fit into his attack on the nationality of appellant. His client was an immigrant, who had come to this country for the protection offered by our ideals. In contrast, appellant was the interloper, not here permanently, but away in the "Philippines, Singapore, or wherever." Appellant did not believe in our ideals and he had no use for them. Appellee was the champion of our "great melting pot."

The references made by appellee to the nationality of appellant were not incidental references. Incidental references to the race of parties or witnesses would not rise to the level of incurable error. *See Guerrero,* 800 S.W.2d at 867. Here, appellee's counsel made great use of appellant's nationality. Such a plea to race, ethnicity or nationality, whether done before the jury with a plea for unity for a party, or for solidarity against a party, is incurable and reversible error occurs. I agree with the court in *Guerrero,* that incurable argument "does not mean simply that no objection need be made; it also means that the argument's harmfulness, its reversible impact, cannot be cured or corrected by instruction." *Id.* at 864. If the argument is incurable, separate harm need not be shown.

Even if appellant was required to show harm, this case clearly illustrates the harmful impact of the argument. In *Reese,* the court said a reversal must come from an evaluation of the whole case, which begins with voir dire and ends with closing argument. *Reese,* 584 S.W.2d at 840. All of the evidence must be examined to determine the argument's probable effect on a material finding. *Id.* The court must look at how long the argument continued, whether it was repeated or abandoned. *Id.*

The record before us shows appellee never abandoned this argument. From the first page of voir dire until the last of closing argument, appellee's counsel drove home this theme of nationality. His statements during voir dire were more blatant than those in his closing arguments. He started by calling appellant "a gun wielding Filipino." He repeatedly referred to appellant's nationality. He asked the venire if anyone knew Imelda or Ferdinand Marcos. He asked if any one on the jury felt a visitor to the United States could "bring that sort of country with" them. He stated that the jury was going to "send a message to the Philippines or to Jakarta, around the world, that you can't have this kind of conduct." A juror told appellant's trial counsel during voir dire that

"anyone who enters this country that I live in and love, to visit, to do business or to reside, in my opinion, must abide by the laws of this land; and in my opinion, this man has not done that. He is not here to answer the charges and apparently puts himself above the law, and I have a real problem with that."

The message of appellee's counsel was getting through. This prospective juror focused on an "attack" on the values of the United States, and not on the imprisonment of appellee.

The effect of the argument can also be seen on the damages awarded by the jury. Appellee's counsel improperly asked the jury to base the actual damages award on the wealth of appellant. He told them to send a message across the world. The jury came back with $500,000 in past damages and another $500,000 in future damages. At trial, appellee put on the following evidence of damages:

## PAST DAMAGES

Medical Bills:
 MacGregor Medical Assoc. $323.00
 Dr. Thomasson 4 office visits [3]
Lost Wages: 6 months, $7,224.00 [4]
Intangible damages for mental anguish, pain & suffering.

---

[3]. No testimony regarding charges; did testify that he was given prescription medication but no evidence introduced on costs.

[4]. No testimony from plaintiff regarding amount lost. Supervisor from Marriott testified that he

## FUTURE DAMAGES

Treatment:
One on one sessions $23,400 [5]
Group sessions $11,700 [6]

---

Intangible damages for mental anguish, pain & suffering.

A liberal reading of appellee's proof shows actual damages in the amount of $42,647. While it is in the province of the jury to determine the award for intangible damages, the evidence before us does not lead to a sound basis for an additional $957,353 in damages. There is no doubt that appellee was subjected to a humiliating and frightening experience. But his testimony at trial was that he had not seen a doctor for follow-up in almost two years. He continued to experience difficulty sleeping but was only taking over-the-counter sleep aids. He still feared appellant but had not had contact with him since he left the Marriott, two years before trial. While in the normal circumstance, a reviewing court should not disturb such an arbitrary award of damages, we can consider the disparity in evaluating the impact of improper argument. Having read the entire record, and finding a scarcity of testimony regarding damages, I have no doubt that the jury was inflamed by counsel for appellee when it made its damages findings. Even though harm is *not* required with this type of argument, the record clearly illustrates the harmful effect of the argument made by appellee's counsel.

This argument was and is "an affront to the court and the equality which it must portray." *Reese*, 584 S.W.2d at 840. I believe the practice of law and the trial of cases should be conducted on a higher plane. I

would sustain appellant's first point of error and remand this cause for a new trial.

---

was making $6–7/hour at time of incident. Using the higher figure, approximate lost wages would be $7,224.00. ($7/hr × 40 × 4.3(wks) × 6(mos)).

5. Dr. Thomasson testified that in a worst case scenario it would take up to three years of one on

one counseling, once a week at $150/hr. ($150 × 52(wks) × 3(yrs)).

6. Dr. Thomasson testified that in a worst case scenario it would take up to three years of group counseling, once a week at $75/hr. ($75 × 52(wks) × 3(yrs)).